**Li Li MANATT, Plaintiff–Appellant,**

v.

**BANK OF AMERICA, NA, Defendant–Appellee.**

No. 01–35847.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 7, 2003.

Filed July 28, 2003.

Scott N. Hunt, Busse & Hunt, Portland, OR, for the plaintiff-appellant.

Darleen Ortega, Davis Wright Tremaine, Portland, OR, for the defendant-appellee.

Before: LAY,* WALLACE, and TALLMAN, Circuit Judges.

TALLMAN, Circuit Judge.

Li Li Manatt is an American citizen of Chinese descent. For two-and-a-half years, from July 1995 to March 1998, Manatt worked in the trade finance department of Bank of America's Portland, Oregon, office. Manatt alleges that, during

* The Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

her time with this group, her co-workers directed "numerous" racial epithets at her, and that these epithets, when viewed in the aggregate, so polluted her workplace that they created a hostile work environment. Manatt also contends that the Bank discriminated against her on account of her race by retaliating against her for various complaints that she made and by constructively discharging her.

The district court granted summary judgment in favor of the Bank on all of Manatt's claims. Manatt now appeals, arguing that the Bank's racial discrimination violated both Title VII of the 1964 Civil Rights Act and 42 U.S.C. § 1981. Because Manatt's hostile work environment claim and one of her retaliation claims are time-barred under Title VII, we must decide whether such claims are cognizable under 42 U.S.C. § 1981. We conclude that § 1981 encompasses retaliation and hostile work environment claims, but nonetheless affirm the district court's grant of summary judgment in favor of the Bank.

## I

## A

In the light most favorable to Manatt, we set forth those facts giving rise to Manatt's hostile work environment discrimination claim. *See Ray v. Henderson,* 217 F.3d 1234, 1239 (9th Cir.2000). We emphasize at the outset that these events occurred over a span of two-and-a-half years while Manatt worked in the trade finance division of the Bank.

On one occasion, Manatt overheard a co-worker tell Bill Gilmore, Manatt's supervisor, that "I am not a China man, I'm not like China man with their eyes like that." Gilmore smiled at the comment. On another occasion, Gilmore told Manatt, "I've had the worst kind of trouble with your countrymen."

Later, Manatt overheard a conversation in which co-workers Barbara Green and Vincent Correia were laughing and saying "China man" and "rickshaw." Seeing Manatt, they pulled their eyes back with their fingers in an attempt to imitate or mock the appearance of Asians.[1]

Apparently, Correia's cubicle—which was adjacent to Manatt's cubicle—was often the source of racially offensive jokes. Manatt heard the phrase "China man" spoken when jokes were told there "on several occasions." Manatt also heard Correia laugh when a co-worker referred to the Chinese as those "communists from Beijing."

The final, most offensive "China" reference occurred on March 10, 1998. That day, Manatt approached Barbara Green with some documents concerning a transaction in Lima, Peru. In describing the documents to Green, Manatt mispronounced "Lima." Rather than ignore the mispronunciation or tactfully correct Manatt, Green informed Manatt that her enunciation was "ridiculous." Manatt then left, but Green refused to drop the issue. Green proceeded to place a telephone call to Peo, a Bank employee from Peru. After contacting Peo, Green shouted to Manatt: "China woman, China woman, China woman, get your butt over here." Shocked, Manatt returned to Green's cubicle. Green then informed Manatt of her phone call to Peo and demanded that Manatt pronounce "Lima" for Peo to hear.

By this time, Correia was also present. Manatt again mispronounced "Lima," and Peo corrected her. While this occurred, Green and Correia laughed, attributing

---

1. Manatt testified that these racial gestures were made on "[q]uite a few occasions." But she could only point to the incident with Green and Correia as an example.

Manatt's mispronunciation to her Chinese ethnicity. Several times they jokingly stated: "That's because she's a China woman."

Following this "Lima incident," Manatt complained to both the Bank's human resources division and to her supervisor, Bill Gilmore. Gilmore told Manatt that she "shouldn't have" contacted Human Resources. According to Gilmore, Green and Correia "were just joking. It wasn't serious." Nonetheless, Gilmore scheduled a staff meeting to discuss the matter. At the meeting, Gilmore instructed Manatt's peers in trade finance "to be more sensitive about each other's feelings." The "China woman" comments and jokes stopped.

### B

Soon after her complaint was addressed, the Bank promoted Manatt and raised her pay. At the end of April 1998, the Bank transferred Manatt from its trade finance division to its private banking division. According to Manatt, this transfer commenced a series of retaliatory acts by the Bank.

In July 1998, however, the Bank selected Manatt to participate in the prestigious United Way loaned-executive program. Manatt testified in her deposition that she did not consider her assignment to United Way as a negative career move; to the contrary, Manatt conceded that she felt honored by her selection and enjoyed her work for the organization. By its nature, the United Way assignment was temporary, and Manatt's work for the organization ended in October 1998.

Returning to the Bank, Manatt discovered that neither a position in private banking nor a position in trade finance was available to her due to downsizing. As a consequence of its merger with Nations-Bank in the fall of 1998, Bank of America eliminated more than 200 positions—including Manatt's former job. The Bank offered Manatt a position as an administrative assistant at her then current salary and title—trade finance specialist.

Manatt reluctantly accepted the temporary administrative assistant position until better work became available. She then applied for various positions within the Bank (including seeking to return to her old group in trade finance) but was rejected for each job she sought.

Notwithstanding her title and pay grade, Manatt says she was essentially working as a receptionist. She attributed this development to discrimination and retaliation. Manatt filed an Oregon Bureau of Labor and Industries (BOLI) complaint against the Bank in April 1999, alleging harassment and retaliation based on her national origin. She then filed the present action on December 21, 1999, in the Multnomah County Circuit Court.

Soon thereafter, in January 2000, Bank of America changed Manatt's permanent job title from "trade finance specialist" to "administrative assistant."

Bank of America removed Manatt's hostile work environment and retaliation claims to the federal district court on February 2, 2000. On April 21, 2000, Manatt resigned from her employment with the bank.

The district court entered summary judgment in favor of Bank of America on August 9, 2001. Manatt brings this timely appeal.

### II

■ We have jurisdiction pursuant to 28 U.S.C. § 1291, and we review de novo the district court's summary judgment in favor of Bank of America. *Ray,* 217 F.3d at 1239.

## A

■ At the outset, we must decide whether Manatt may bring a hostile work environment discrimination claim under 42 U.S.C. § 1981, as her Title VII hostile work environment claim is untimely.[2] We have little difficulty in holding that such a claim is actionable under § 1981.

Among other things, § 1981 guarantees "all persons" the same right as white citizens to "make and enforce contracts."[3] 42 U.S.C. § 1981(a). In *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), the Supreme Court construed the "make and enforce" language narrowly in the employment context to exclude a cause of action for employment discrimination occurring during the course of the employment. 491 U.S. at 179–180, 109 S.Ct. 2363 (holding that a hostile work environment discrimination claim is not actionable under § 1981). In response to the *Patterson* holding, Congress amended § 1981 as part of the 1991 Civil Rights Act. Congress added subsection (b), which defines "make and enforce contracts" as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privi-

leges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). We now join every other circuit to have decided this issue and hold that the congressional amendment to § 1981 evinced congressional intent to permit hostile work environment claims under § 1981.[4] A hostile work environment interferes with the "enjoyment of all benefits ... and conditions of the contractual relationship" of employment and is therefore actionable under § 1981.

■ We also recognize that those legal principles guiding a court in a Title VII dispute apply with equal force in a § 1981 action. *See EEOC v. Inland Marine Indus.,* 729 F.2d 1229, 1233 n. 7 (9th Cir. 1984) ("A plaintiff must meet the same standards in proving a § 1981 claim that he must meet in establishing a ... claim under Title VII ...."); *see also Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 69 (2d Cir.2000) (analogizing a § 1981 claim to a Title VII claim); *Danco, Inc. v. Wal Mart Stores, Inc.,* 178 F.3d 8, 13 (1st Cir.1999) (noting that the language in § 1981(b) "tracks language of Title VII prohibiting discrimination with respect to 'compensation, terms, conditions, or privi-

**2.** In *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 105, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), the Supreme Court held that Title VII "precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period." Here, the alleged hostile work environment discrimination ended in March 1998. Manatt did not file her BOLI complaint until April 1999— well outside the 300 day limitation period. *See* 42 U.S.C. § 2000e–5(e) (complaint to state agency must be made within 300 days of the discriminatory act).

The Bank does not challenge the timeliness of Manatt's § 1981 claim.

**3.** Section 1981(a) generally provides:

All persons within the jurisdiction of the United States shall have the same right in

every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. 42 U.S.C. § 1981(a).

**4.** *See, e.g., Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 68–69 (2d Cir.2000); *Danco, Inc. v. Wal–Mart Stores, Inc.,* 178 F.3d 8, 13 (1st Cir.1999); *Witt v. Roadway Express,* 136 F.3d 1424, 1431–32 (10th Cir.1998); *Jackson v. Motel Six Multipurpose, Inc.,* 130 F.3d 999, 1008 n. 17 (11th Cir.1997); *Dennis v. County of Fairfax,* 55 F.3d 151, 155 (4th Cir.1995); *Johnson v. Uncle Ben's, Inc.,* 965 F.2d 1363, 1372 (5th Cir.1992).

leges of employment' "); *Jurado v. Eleven–Fifty Corp.,* 813 F.2d 1406, 1412 (9th Cir.1987).

## B

■ Bank of America argues that Manatt cannot maintain her § 1981 claim in any event because Manatt has alleged national origin—not racial—discrimination. *See Runyon v. McCrary,* 427 U.S. 160, 168, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976) (noting that § 1981 applies only to race-based discrimination). We hold that Manatt has presented a factual dispute as to the Bank's discrimination on account of her race. For instance, her co-workers pulled their eyelids to imitate or mock those of the Asian race. Eye shape has nothing to do with national origin. Moreover, the Supreme Court has ruled that when Congress enacted § 1981, it intended "race" to be defined broadly, to cover discrimination against ethnic groups such as the Chinese. *Saint Francis Coll. v. Al-Khazraji,* 481 U.S. 604, 612–13, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987) (noting that it is "clear" that Congress intended to protect "immigrant groups such as the Chinese" through § 1981); *see also London v. Coopers & Lybrand,* 644 F.2d 811, 818 n. 4 (9th Cir.1981).[5]

## C

■ We now turn to the merits. To establish the prima facie hostile work environment claim under either Title VII or § 1981, Manatt must raise a triable issue of fact as to whether (1) she was "subjected to verbal or physical conduct" because of her race, (2) "the conduct was unwelcome," and (3) "the conduct was sufficiently severe or pervasive to alter the conditions of [Manatt's] employment and create

an abusive work environment." *Kang v. U. Lim Am., Inc.,* 296 F.3d 810, 817 (9th Cir.2002). Viewing the evidence in the light most favorable to Manatt, we conclude that the conduct of Manatt's co-workers and supervisor—while offensive and inappropriate—did not so pollute the workplace that it altered the conditions of her employment. Her hostile work environment discrimination claim must therefore fail.

Section 1981, like Title VII, is not a "general civility code." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (discussing Title VII). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Id.* (internal citation omitted); *see also Jordan v. Clark,* 847 F.2d 1368, 1374–75 (9th Cir.1988) (finding no hostile work environment where "off-color" jokes were told in workplace).

We think the actions of Manatt's co-workers generally fall into the "simple teasing" and "offhand comments" category of non-actionable discrimination. Manatt overheard jokes in which the phrase "China man" was used. And she overheard a reference to China and communism. But on only a couple of occasions did Manatt's co-workers or supervisor direct their racially insensitive "humor" at Manatt. One such instance occurred when Barbara Green and Vincent Correia ridiculed Manatt for mispronouncing "Lima." Another instance occurred when Green and Correia, upon seeing Manatt, pulled their eyes back with their fingers in an attempt to imitate or mock the appearance of Asians.

---

**5.** Manatt's claim to BOLI that she was discriminated against based on her national origin does not preclude her § 1981 claim that she was also discriminated against based on her race.

Under our case law, this conduct was neither severe nor pervasive enough to alter the conditions of Manatt's employment. *See Vasquez v. County of Los Angeles,* 307 F.3d 884, 893 (9th Cir.2002) (finding no hostile environment discrimination where the employee was told that he had "a typical Hispanic macho attitude," that he should work in the field because "Hispanics do good in the field" and where he was yelled at in front of others); *Kortan v. Cal. Youth Auth.,* 217 F.3d 1104, 1111 (9th Cir.2000) (finding no hostile work environment where the supervisor referred to females as "castrating bitches," "Madonnas," or "Regina" in front of plaintiff on several occasions and directly called plaintiff "Medea"). *Compare Kang,* 296 F.3d at 817 (finding that a Korean plaintiff suffered national origin harassment where the employer verbally *and physically* abused the plaintiff because of his race); *Nichols v. Azteca Rest. Enters.,* 256 F.3d 864, 872–73 (9th Cir.2001) (finding a hostile work environment where a male employee was called "faggot" and "fucking female whore" by co-workers and supervisors at least once a week and often several times per day); *Anderson v. Reno,* 190 F.3d 930 (9th Cir.1999) (finding a hostile work environment where a supervisor repeatedly referred to the employee as "office sex goddess," "sexy," and "the good little girl" and where he humiliated the employee in public by drawing a pair of breasts on an easel while the employee was making a presentation and then told the assembled group that "this is your training bra session," and where the employee received vulgar notes and was patted on the buttocks and told she was "putting on weight down there"), *abrogated on other grounds in Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106; *Draper v. Coeur Rochester,* 147 F.3d 1104, 1109 (9th Cir.1998) (finding hostile work environment where plaintiff's supervisor made repeated sexual remarks to her, told her of his sexual fantasies and desire to have sex with her, commented on her physical characteristics, and asked over a loudspeaker if she needed help changing her clothes).

We are certainly troubled by the "Lima incident" and by the racially offensive gesture made by Green and Correia. We also recognize that these events caused Manatt to suffer pain.[6] If these actions had occurred repeatedly, Manatt may very well have had an actionable hostile environment claim. *See Brooks v. City of San Mateo,* 229 F.3d 917, 926 (9th Cir.2000) (noting that "the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct") (citations omitted). But these two regrettable incidents occurring over a span of two-and-a-half years, coupled with the other offhand remarks made by Manatt's co-workers and supervisor, did not alter the conditions of Manatt's employment. Her hostile work environment claim must fail.[7]

**6.** "The working environment must both subjectively and objectively be perceived as abusive." *Brooks v. City of San Mateo,* 229 F.3d 917, 923 (9th Cir.2000) (quotation marks and citation omitted). In considering whether Manatt subjectively perceived her work environment as abusive, we think that Manatt's efforts to return to the trade finance group are relevant. But we only hold here that Manatt's work environment, as a matter of law, was not so objectively abusive as to alter the conditions of her employment.

**7.** Because we conclude that Manatt has not made out the prima facie case for hostile work environment discrimination, we do not address whether the Bank would be entitled to invoke the *Faragher* affirmative defense to liability. *Faragher,* 524 U.S. at 806–07, 118 S.Ct. 2275. We do note, however, that when Manatt requested action, her supervisor called her co-workers together and admonished them to stop their behavior. His order was obeyed.

## III

■ We now address Manatt's several retaliation claims. To make out a prima facie case of retaliation under Title VII, Manatt must establish that: (1) she engaged in a protected activity, such as the filing of a complaint alleging racial discrimination,[8] (2) the Bank subjected her to an adverse employment action,[9] and (3) "a causal link exists between the protected activity and the adverse action." *Ray*, 217 F.3d at 1240. If Manatt has asserted the prima facie retaliation claim, the burden shifts to Bank of America to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* "If [Bank of America] articulates such a reason, [Manatt] bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive." *Id.*

We discuss each of Manatt's retaliation claims in turn.

## A

■ Approximately one month after Manatt complained to her supervisor and to human resources about the "Lima incident," the Bank transferred Manatt from its trade finance department to the private banking department. Manatt contends that the Bank made this transfer in retaliation for her complaint.

This alleged retaliatory act occurred at the beginning of May 1998, but Manatt did not file her Oregon BOLI complaint until April 1999. Because Manatt did not file the state complaint within 300 days of the transfer, her retaliation claim is untimely under Title VII. *See* 42 U.S.C. § 2000e–5(e); *Morgan*, 536 U.S. at 105, 122 S.Ct. 2061 (holding that Title VII "precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period"). We must therefore decide whether a retaliation claim may properly be brought under § 1981.[10]

■ We reaffirm our prior holding in *London v. Coopers & Lybrand* that where a plaintiff charges an employer with racial discrimination in taking retaliatory action, a cause of action under § 1981 has been stated. If an employer retaliates against the former employee with the intent to perpetuate the original act of discrimination, or with some other racially discriminatory motive in mind, then interference with rights protected by § 1981 has occurred, and that section must come into play.

644 F.2d at 819.[11] Manatt contends that the Bank retaliated against her for com-

---

**8.** Manatt's various complaints, including the complaint to her supervisor following the "Lima incident," were "protected activities." *See* 42 U.S.C. § 2000e–3(a).

**9.** This Circuit has defined "adverse employment action" broadly to mean any employment decision "reasonably likely to deter employees from engaging in protected activity." *Ray*, 217 F.3d at 1243. *But see Vasquez*, 307 F.3d at 891 (narrowing the rule announced in *Ray* and holding that an employment decision must be objectively adverse to constitute an adverse employment action).

**10.** The Bank does not challenge the timeliness of Manatt's § 1981 claim.

**11.** Other circuits are in accord. *See, e.g., Foley v. Univ. of Houston Sys.*, 324 F.3d 310, 316 (5th Cir.2003) (holding that "an employee's claim that he was subjected to retaliation because he complained of race discrimination is a cognizable claim under § 1981(b)"); *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 693 (2d Cir.1998) ("We remain of the view, in light of the broad sweep of § 1981(b), that a retaliation claim may be brought under § 1981."); *Andrews v. Lakeshore Rehab. Hosp.*, 140 F.3d 1405, 1411 (11th Cir.1998) (noting that the legislative history for the 1991 Civil Rights Act supports the conclusion that Congress intended retaliation claims to be cognizable under § 1981(b)); *see also O'Neal v. Ferguson Constr. Co.*, 237 F.3d

plaining to her supervisor and to human resources about racial discrimination; therefore, her retaliation claim is cognizable under § 1981.

 Utilizing the Title VII framework for analyzing Manatt's retaliation claim, *see Jurado,* 813 F.2d at 1412, we conclude that Manatt failed to rebut the Bank's legitimate nondiscriminatory reason for the transfer. Assuming that Manatt established the prima facie case of retaliation before the district court, which we do not decide, the Bank came forward with evidence indicating that Manatt's transfer was the result of a reduction in work volume-not retaliation. According to the Bank's evidence, the Asian financial crisis as well as the Bank's decision to transfer work from its Portland to its Seattle office led to Manatt's transfer. Manatt herself admitted that the trade finance group suffered from a reduction in workload.[12]

In spite of the conceded reduction in work volume, Manatt argues that the Bank "is not insulated from liability regarding its decision as to who to lay off." According to Manatt, the Bank's decision to transfer her, and not another employee, was discriminatory retaliation. We disagree. The Bank introduced unchallenged evidence indicating that the employee retained instead of Manatt (1) received better work evaluations than Manatt, (2) had significantly more experience than Manatt in international trade, (3) brought her own client, Nike, with her to trade finance, and (4) was responsible for grain transactions typically having values of $250,000 to $7 million, whereas Manatt required supervi-

sion for any transaction greater than $20,000.

The Bank offered a legitimate, nondiscriminatory reason for its decision to transfer Manatt to private banking rather than the co-worker. Manatt therefore had the burden of showing "that the [Bank's] explanation[was] merely a pretext for impermissible retaliation." *Winarto v. Toshiba Am. Elecs. Components, Inc.,* 274 F.3d 1276, 1284 (9th Cir.2001). Because Manatt failed to introduce any direct or specific and substantial circumstantial evidence of pretext, summary judgment for the Bank must be affirmed. *Id. See also Bradley v. Harcourt, Brace & Co.,* 104 F.3d 267, 270 (9th Cir.1996) (explaining that "an employee's subjective personal judgments of her competence alone do not raise a genuine issue of material fact").

B

After Manatt worked in the private banking division for about three months, the Bank selected her to participate in the United Way loaned-executive program. Manatt was honored by her selection to the United Way program and does not claim that her selection was in any way motivated by racial animus or retaliation. But after the United Way program ended in October 1998, Manatt was informed by the Bank that neither her position in private banking nor her former position in trade finance was then available. Manatt was urged to take an administrative assistant position with the Bank for about 45 days and wait for a position to open. She

---

1248, 1258 (10th Cir.2001); *Kim v. Nash Finch Co.,* 123 F.3d 1046, 1059 (8th Cir. 1997).

**12.** Notwithstanding this admission, Manatt argues that *her* volume of work had not declined and that the department was always "busy." She therefore argues that the Bank cannot articulate a non-discriminatory reason

for transferring her. But simply because Manatt's volume of work did not decrease does not mean that her work quality was superior to others. Manatt's argument also does not take into account other factors in transfer decisions during downsizing, such as seniority.

did.[13] After one month expired, Paula Ordway, a senior Bank executive, informed Manatt that she had three options: (1) accept the administrative position on a more long-term basis, (2) consider taking a position at a branch office, or (3) accept a severance package. Manatt chose to accept the administrative position while continuing to look for other work within the Bank.

### 1

In late 1998 or early 1999, Manatt was rejected for a different administrative assistant position. A short time later, in January or February 1999, the Bank declined to transfer Manatt to a position in the trade finance department. These two adverse decisions, Manatt contends, were retaliatory acts by the Bank for her March 1998 complaint following the "Lima incident." We conclude that the district court properly granted summary judgment for the Bank on these two retaliation claims because Manatt cannot establish a causal link between the publication of her complaint and the Bank's decision not to transfer her.

We find no evidence, direct or circumstantial, from which a jury might infer causation. To the contrary, the evidence suggests no causality at all. In the period of time between Manatt's complaint and the Bank's decisions not to transfer her, the Bank gave Manatt a pay raise and selected her for a prestigious assignment with the United Way. While courts may infer causation based on the "proximity in time between the protected action and the allegedly retaliatory employment decision," *Ray*, 217 F.3d at 1244 (quoting *Yart-*

*zoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir.1987)), such an inference is not possible in this case because approximately nine months lapsed between the date of Manatt's complaint and the Bank's alleged adverse decisions. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam) (noting that a court may not infer causation from temporal proximity unless the time between an employer's knowledge of protected activity and an adverse employment action is "very close" and citing cases for the proposition that a three-month and four-month time lapse is insufficient to infer causation).

### 2

We also reject Manatt's retaliation claim regarding the Bank's decision not to transfer her to a letter-of-credit specialist position in February 2000. Manatt has satisfied the prima facie case for this retaliation claim: the adverse employment decision followed on the heels of her complaint alleging racial discrimination in the Multnomah County Circuit Court. But Manatt did not rebut the Bank's legitimate, nondiscriminatory reason for choosing another candidate.

Bonnie Anderson, the vice president in charge of filling the letter-of-credit specialist position, interviewed four candidates, including Manatt. She ultimately selected Alan Kasabuchi for the job, even though Manatt had more relevant experience than Kasabuchi. In explaining why Kasabuchi was chosen instead of Manatt, Anderson testified that Kasabuchi "had a lot of enthusiasm" and was in a priority placement.[14] Anderson also explained that Ma-

---

13. Manatt does not argue that the Bank's failure to find her a more substantive position immediately after her United Way work ended was retaliation for her March 1998 complaint.

14. Manatt argues that she was also a "priority-placement" employee. Assuming this fact, Manatt asserts that the Bank deviated from its policy of choosing the most qualified "priority-placement" candidate to fill a position.

natt "was interested in a position involving sales. And this job does not have any sales associated with it whatsoever."

Manatt did not introduce any direct evidence, nor did she introduce any specific and substantial circumstantial evidence, to overcome the legitimate reasons offered by the Bank for hiring Kasabuchi instead of Manatt.[15] We therefore affirm the district court's grant of summary judgment on this retaliation claim.

### C

[■] We also reject Manatt's remaining retaliation claims. First, Manatt alleges that Paula Ordway[16] stared at Manatt in an angry way and allowed Manatt's co-workers to be mean to her. Mere ostracism in the workplace is not grounds for a retaliation claim, however, and Manatt's claim on this theory must therefore fail. *See Brooks*, 229 F.3d at 929; *Ray*, 217 F.3d at 1241.

Second, Manatt contends that the Bank retaliated against her when it changed her job title from "trade finance specialist" to "administrative assistant" and downgraded her from an officer to a receptionist. For this retaliation claim, the district court correctly concluded that Manatt failed to demonstrate causation because she offered no evidence showing that the change in job title and grade was not due to the fact that Manatt had become entrenched in the administrative assistant position. Indeed, by the time the Bank changed Manatt's job title and grade in January 2000, Manatt had been employed as an administrative assistant for approximately fifteen months.

Finally, Manatt argues that she suffered retaliation when Paula Ordway stopped helping her find work in April 1999 after Manatt filed her BOLI complaint. But according to Manatt's sworn affidavit, Ordway *never* helped her find work in the months preceding the filing of her BOLI complaint.[17] Manatt is therefore unable to

---

She says that this deviation from policy is evidence of discrimination. *Miller v. Fairchild Indus., Inc.*, 885 F.2d 498, 506 (9th Cir.1989).

We do not accept Manatt's argument. First, we can find no evidence in the record indicating that Manatt was, in fact, a "priority placement" employee. The declaration of Paula Ordway, to which Manatt cites, suggests that Manatt *would have been* a priority placement *if* she had accepted a severance package and left the Bank. Since Manatt never left the Bank, it appears to us that she could not have been considered a priority placement. Even if we assume that Manatt qualified for priority placement, Manatt does not explain why the Bank was required to select her for the letter-of-credit position instead of Kasabuchi. We can find no evidence in the record suggesting that the Bank's policy was to hire only the most experienced priority-placement employees. In other words, nothing indicates that Anderson singled Manatt out for unfavorable treatment in applying the priority-placement preference. Finally, Anderson testified that she did not

know of Manatt's prior complaints, and Manatt did not rebut this testimony.

15. In her sworn affidavit, Manatt states: "It is not true I told Ms. Bonnie Anderson I was not interested in the import letter of credit position, or was *only* interested in sales." (emphasis added). We disagree with Manatt that this statement somehow negates the legitimate reasons offered by Anderson for hiring Kasabuchi instead of Manatt. Anderson testified that she hired Kasabuchi because she subjectively believed: (1) Kasabuchi had more enthusiasm for the position than Manatt, and (2) Manatt was primarily interested in sales. Manatt's affidavit statement in no way suggests that Anderson's proffered justification for the hiring decision was a mere pretext for unlawful retaliation.

16. Ordway was Manatt's immediate supervisor during the time Manatt worked as an administrative assistant.

17. In her sworn affidavit, Manatt states: "Ms. Ordway never set up one appointment for me and never called one position to my attention

establish a causal link between the filing of her BOLI complaint and the alleged adverse employment action.

### IV

■ Manatt's constructive discharge claim is untenable in light of the fact that the alleged racially offensive work environment ended in March 1998, but Manatt did not quit working for the Bank until April 21, 2000. *See Montero v. Agco Corp.*, 192 F.3d 856, 861 (9th Cir.1999) (finding no constructive discharge where the harassing behavior ended three to four months before the plaintiff resigned). Moreover, we have held that "[w]here a plaintiff fails to demonstrate the severe or pervasive harassment necessary to support a hostile work environment claim, it will be impossible for her to meet the higher standard of constructive discharge: conditions so intolerable that a reasonable person would leave the job." *Brooks*, 229 F.3d at 930.

### V

Manatt's co-workers' and supervisor's offensive actions were neither severe nor pervasive enough to alter the conditions of Manatt's employment. Her § 1981 hostile work environment claim must therefore fail. Manatt's myriad allegations of retaliation, as well as her constructive discharge claim, are also without merit. The district court properly entered summary judgment against her.

**AFFIRMED.**

except in July 1999, when she suggested I take a receptionist's position on a different