**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHRISTOPHER LYNN JOHNSON, M.D.,
*Plaintiff-Appellant,*

v.

RIVERSIDE HEALTHCARE SYSTEM, LP,
a California limited partnership,
d/b/a Riverside Community
Hospital; RIVERSIDE HEALTHCARE
SYSTEM, LLC, a California limited
liability corporation; COLUMBIA/
HCA WESTERN GROUP, INC., a
Tennessee corporation, doing
business in California; MEDICAL
STAFF OF RIVERSIDE COMMUNITY
HOSPITAL, a California
unincorporated association; ROBERT
DUNCANSON, M.D.; LIBBY MARTIN;
BARBARA MARSHALL; GAY
DICKINSON; PATRICIA LEMMLE; EARL
TATE; MICHAEL RAWLINGS,
*Defendants-Appellees.*

No. 06-55280

D.C. No.
CV-03-01392-ABC

OPINION

Appeal from the United States District Court
for the Central District of California
Audrey B. Collins, District Judge, Presiding

Argued and Submitted
October 18, 2007—Pasadena, California

Filed February 13, 2008

1295

Before: Diarmuid F. O'Scannlain and Milan D. Smith, Jr., Circuit Judges, and Michael W. Mosman,* District Judge.

Opinion by Judge O'Scannlain

---

*The Honorable Michael W. Mosman, United States District Judge for the District of Oregon, sitting by designation.

## COUNSEL

Dale L. Gronemeier, Gronemeier & Associates, P.C., South Pasadena, California, argued the cause for the plaintiff-appellant, and filed briefs.

James L. Payne, Payne & Fears LLP, Irvine, California, argued the cause for the defendants-appellees, and filed a brief; Laura Fleming, Payne & Fears LLP, Irvine, California, and Tami Smason, Foley & Lardner LLP, Los Angeles, California, were on the brief.

## OPINION

O'SCANNLAIN, Circuit Judge:

We are called upon to decide whether a physician who asserts that he was discriminated against (based on his race, sexual orientation, and perceived disability) by doctors and nurses at the hospital where he treated patients can establish civil rights claims under federal and state law.

I

A

Christopher Lynn Johnson worked as a physician at the Riverside Community Hospital ("Riverside")[1] and as a member of the Medical Staff of Riverside Community Hospital ("Medical Staff") from October 1999 until February 2002. Johnson's responsibilities included performing plastic surgeries and providing trauma consultations in Riverside's emergency room. Johnson identifies himself as African American and bisexual. Soon after he began his tenure at Riverside, Johnson alleges that several physicians regularly harassed him because of his sexual orientation and their mistaken belief that he suffered from HIV/AIDS. He alleges that several nurses harassed him and refused to participate in surgeries with him for the same reasons. In addition, Johnson points to one particularly serious incident of racial discrimination during his time at Riverside. According to Johnson, a colleague, Dr. Vlasak, admonished him by using a racial slur after Johnson performed surgery on one of Vlasak's patients. As the facts are set forth in Johnson's complaint, Vlasak failed to review the patient's CT scan and consequently failed to realize that the patient was suffering from a skull fracture with an underlying brain contusion. Upon discovering the problem, Johnson admitted the patient for surgery and performed the necessary procedure. When Vlasak learned that Johnson had corrected (and therefore exposed) his oversight, Vlasak moved as if to strike Johnson, "charged" into the room where Johnson was standing and "screamed . . . 'You fucking nigger—why did you do that to me?' "

---

[1]Also named as defendants in this suit are Riverside Healthcare System, LLC ("RHCS"), a limited partnership doing business as Riverside under California law, and Columbia/HCA Western Group, Inc., a Tennessee corporation with an ownership interest in RHCS. Hereinafter, all three entities will be referred to collectively as "Riverside."

Johnson worked at Riverside under the terms of a professional services agreement. The contract explicitly designated Johnson as a "Contractor," rather than an employee. The contract also required Johnson to retain his membership and privileges with the Medical Staff. Failure to do so was a cause for termination. In February 2002, Johnson's Medical Staff privileges were revoked after he failed to pay his membership dues by a deadline Johnson claims the Medical Staff imposed arbitrarily and without warning while he was traveling out of the country. Because full membership on the Medical Staff was a condition of his contract, Riverside terminated Johnson soon afterwards. Johnson immediately applied to the Medical Staff for reinstatement, but was informed that he could only regain his status by reapplying to the Staff as a new applicant, which would require him to submit to a hearing before the Medical Staff Credentials Committee. Johnson obliged, and was confronted at the hearing with numerous complaints about his behavior filed by co-workers, all of which he contends were fabricated. After the hearing, the Committee voted to uphold the denial of Johnson's Medical Staff membership. Prior to the completion of the hearing, Riverside filed a report describing the complaints against Johnson with the California Medical Board pursuant to California Business and Professions Code § 805. Johnson argues that the filing of this report was premature and cost him future opportunities for employment.

B

On September 26, 2002, Johnson filed a complaint against Robert Duncanson, the Chief of the Medical Staff, with the California Department of Fair Employment and Housing ("DFEH") alleging that he had been harassed, denied employment, and denied privileges to admit patients to Riverside on account of his race and sexual orientation. On September 30, 2002, DFEH issued Johnson right-to-sue notices for Duncanson and several other individuals on the Medical Staff and nursing staff.

On September 2, 2003, Johnson filed a complaint in California state court against Riverside and several other defendants setting forth multiple civil rights claims under federal and state law. He voluntarily dismissed that action, however, on October 16, 2003. Later, on December 2, 2003, Johnson filed a complaint in the District Court for the Central District of California against Riverside, the Medical Staff, Duncanson, and other individuals alleging the same causes of action, including three relevant to this appeal: (1) racial discrimination in violation of 42 U.S.C. § 1981; (2) racial and sexual orientation discrimination in violation of California Civil Code § 51 (the "Unruh Civil Rights Act claim") and § 51.5; and (3) racial and sexual orientation discrimination in violation of California's Fair Employment and Housing Act ("FEHA"), Cal. Gov't. Code §§ 12940 *et seq*.

The defendants moved to dismiss all claims under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The district court dismissed Johnson's claims under California Civil Code §§ 51 and 51.5 with prejudice, finding that Johnson had failed to state a claim upon which relief could be granted because neither provision creates a cause of action for employment discrimination. The district court did not specifically address Johnson's § 1981 claims, but dismissed his remaining claims, including his FEHA claims, without prejudice, granting him leave to amend.

Johnson timely filed a first amended complaint which omitted, and thereby waived, all other claims except those mentioned here. Thereafter, he reached a settlement with several defendants, leaving only Riverside, Duncanson, and the Medical Staff as defendants in this action. The district court then dismissed each of Johnson's remaining claims under Rule 12(b)(6) for failure to state a claim.

Johnson appeals. First, he argues that the district court erred in dismissing his § 1981 claims against all three defendants, contending that he raised a triable issue of fact as to

whether the defendants created a racially hostile work environment in violation of that provision. Second, Johnson argues that the district court erred in dismissing his §§ 51 and 51.5 claims because both recognize a cause of action for the type of workplace discrimination Johnson alleges here. Finally, Johnson argues that the district court erred in dismissing his FEHA claims against all three defendants even though the statute of limitations expired, suggesting that he was entitled to equitable tolling. We consider each argument in turn.

## II

The district court dismissed without discussion Johnson's § 1981 claim. Nevertheless, we may affirm the district court's determination on any ground supported by the record. *Papa v. United States*, 281 F.3d 1004, 1009 (9th Cir. 2002) (citing *Vestar Dev. II v. Gen. Dynamics Corp.*, 249 F.3d 958, 960 (9th Cir. 2001)). A Rule 12(b)(6) dismissal may be based on either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990) (citation omitted). In reviewing the district court's decision, we view Johnson's complaint in the light most favorable to him, accepting all well-pleaded factual allegations as true, as well as any reasonable inferences drawn from them. *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003) (citations omitted).

## A

**[1]** Among other things, § 1981 guarantees "all persons" the right to "make and enforce contracts." 42 U.S.C. § 1981(a). Section 1981(b) defines that right to include the right to the "enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." As a consequence, we have found claims alleging a hostile work environment cognizable under § 1981. *Manatt v. Bank of America*, 339 F.3d 792, 797 (9th Cir. 2003). Nevertheless, § 1981 only

creates a cause of action for those plaintiffs discriminated against on the basis of their race or ethnicity. *See Jones v. Bechtel*, 788 F.2d 571, 574 (9th Cir. 1986) (holding that a plaintiff could not assert a § 1981 claim based on gender discrimination) (citations omitted); *see also Magana v. N. Mariana Islands*, 107 F.3d 1436, 1446-47 (9th Cir. 1997) (holding that plaintiff's claim that she was "Filipino" was a sufficient basis for § 1981 relief). Thus, although Johnson's complaint alleges numerous incidents of sexual orientation discrimination, only his allegations of racial discrimination are relevant to his § 1981 claim.

A prima facie claim for hostile work environment under § 1981 must raise triable issues of fact as to whether "(1) [the plaintiff] was subjected to verbal or physical conduct because of [his] race, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive work environment." *Manatt*, 339 F.3d at 798 (quoting *Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 817 (9th Cir. 2002)) (internal quotation marks omitted). Moreover, the work environment must be perceived as abusive from both a subjective and objective point of view. *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000). In examining whether the workplace was objectively abusive, we consider the perspective of a reasonable person with the plaintiff's same fundamental characteristics. *See Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995). Finally, in considering whether the discriminatory conduct was sufficiently severe or pervasive, we look to "all the circumstances, including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1110 (9th Cir. 2000) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998)).

B

**[2]** Johnson alleges one particularly serious incident of discrimination. Johnson's encounter with Dr. Vlasak, in which Vlasak used a racial epithet and moved as if to strike Johnson, is unquestionably evidence of discrimination standing alone. Consequently, our task becomes to determine whether this incident, combined with Johnson's other allegations, raises a triable issue of fact as to whether the discrimination Johnson faced at Riverside was so "severe or pervasive" as to alter the conditions of his employment and create an abusive work environment. *Manatt*, 339 F.3d at 798; *see also Brooks*, 229 F.3d at 923 (noting that "the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct") (citations omitted).

**[3]** Turning to these allegations, however, we find no indication that Johnson was subjected to racial discrimination on any other occasion aside from the incident with Dr. Vlasak. Johnson contends that a particular nurse frequently asked him to remove trash from the Operating Room and, on one occasion, refused to provide him with the necessary surgical equipment to perform a procedure. He also contends that after he was bitten by the security dog stationed in Riverside's emergency room, the dog's trainer told him not to complain to the hospital administrators because the dog was "more popular" with the nurses than Johnson. Although these comments and actions may have been offensive, Johnson provides no evidence to suggest that they were motivated by racial animus rather than mere personal dislike.

**[4]** Johnson also alleges that the Medical Staff's Residency Selection Committee refused to consider an African-American candidate because of his race and, after rejecting the application, the Chairman and other members of the committee "stated in the presence of other physicians" that they would not consider the applicant because he was African-

American and might be gay. Johnson's complaint does not allege that he was present at the time the candidate's application was denied or at the time the Committee members' racially offensive remarks were made. It is true that discriminatory conduct directed at an individual other than the plaintiff may be relevant to a plaintiff's hostile work environment claim in certain circumstances. *See Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1033-34 (9th Cir. 1998) ("[R]acist attacks need not be directed at the complainant in order to create a hostile educational environment [under Title VI]." (citations omitted)); *see also Vinson v. Taylor*, 753 F.2d 141, 146 (D.C. Cir. 1985) ("[E]vidence tending to show [a supervisor's] harassment of other women working alongside [the plaintiff] is directly relevant to the question whether [the supervisor] created an environment violative of Title VII") (citation omitted). In this case, however, the Committee members' conduct was not directed at Johnson, and he alleges that he only learned about it indirectly. Thus, Johnson points to just two incidents of discriminatory conduct over the course of his twenty-eight-month tenure at Riverside, and only one in which he was the victim.

**[5]** In the past, we have held that isolated incidents, unless "extremely serious," are insufficient to state a claim for hostile work environment. *Manatt*, 339 F.3d at 798 (quoting *Faragher*, 524 U.S. at 788); *Vasquez v. County of Los Angeles*, 349 F.3d 634, 642-43 (9th Cir. 2002) (concluding that employee failed to state a hostile work environment claim under Title VII where he was yelled at in front of others and told that he had "a typical Hispanic macho attitude," and that he should work in the field because "Hispanics do good in the field"); *Kortan*, 217 F.3d at 1110-11 (holding that a plaintiff failed to state a hostile work environment claim where her supervisor referred to other females as "castrating bitches," "Madonnas," or "Regina" in her presence and called the plaintiff "Medea" at least once). Thus, to establish the severe or pervasive discrimination necessary for a hostile work environment claim, we have required plaintiffs to allege that the

offending conduct occurred with a greater frequency than Johnson has here. *See Craig v. M & O Agencies, Inc.*, 496 F.3d 1047, 1056-57 (9th Cir. 2007) (determining that a female employee established a prima facie case for hostile work environment where her boss repeatedly solicited her to perform sexual favors over several months and engaged in five significant incidents of harassing conduct, including one in which he followed her into a women's restroom and kissed her); *Nichols v. Azteca Rest. Enters.*, 256 F.3d 864, 872-73 (9th Cir. 2001) (concluding that an employee had stated a hostile work environment claim where co-workers and supervisors called him a "faggot" and a "fucking female whore" at least once a week and often several times a day).

Our decision in *Manatt* is particularly instructive. In that case, a bank employee of Chinese descent filed a hostile work environment claim against the bank where she was employed. Manatt alleged that she frequently overheard co-workers make jokes about China and "communists from Beijing" and that she was the victim of two particularly serious incidents of discrimination: an occasion in which two of her co-workers made jokes about China in her presence and then pulled their eyes back with their fingers in an attempt to mock the appearance of Asians, and a separate incident in which another co-worker told her that her enunciation of the word "Lima" was "ridiculous," later shouted, "China woman, China woman, China woman, . . . get your butt over here" and instructed Manatt to repeat the word for a colleague listening over the telephone and, when Manatt complied, broke out in laughter, attributing Manatt's mispronunciation to the fact that she was a "China woman." 339 F.3d at 795-96.

**[6]** In reviewing Manatt's allegations, we acknowledged the severity of both events, but nevertheless concluded that "two regrettable incidents occurring over a span of two-and-a-half years, coupled with other offhand remarks made by Mannatt's co-workers and supervisor, did not alter the conditions of Manatt's employment." *Id.* at 799. Our reasoning in *Manatt*

compels a similar result in this case. Johnson alleges that he was the victim of only one incident of discrimination over the course of his twenty-eight-month tenure at Riverside, and that he learned indirectly of another. While both incidents were serious and undoubtedly caused Johnson to suffer, particularly the incident in which he was the victim, our precedents require a plaintiff to allege more than two isolated events to establish that he was subjected to a hostile work environment in violation of § 1981.

**[7]** Accordingly, we conclude that Johnson has not raised a triable issue of fact as to whether he suffered "severe and pervasive" discrimination at Riverside and that, as a consequence, his § 1981 claims against the defendants must fail.

## III

Our next task is to determine whether the district court erred in dismissing Johnson's claims under California Civil Code §§ 51 and 51.5.

### A

#### 1

**[8]** California Civil Code § 51 codifies the Unruh Civil Rights Act and provides that all persons within the State of California are "free and equal" and "no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code § 51(b). California courts have interpreted the term "business establishment" in the "broadest sense reasonably possible," *see Burks v. Poppy Constr. Co.*, 57 Cal. 2d 463, 468 (1962), and hospitals such as Riverside meet the definition. *O'Connor v. Vill. Green Owners Ass'n*, 33 Cal. 3d 790, 796 (1983). Nevertheless, the

California Supreme Court has expressly held that employment discrimination claims are excluded from § 51's protection. *Alcorn v. Anbro Eng'g, Inc.*, 2 Cal. 3d 493, 500 (1970); *Rojo v. Kliger*, 52 Cal. 3d 65, 77 (1990). The court has explained this exclusion by noting that the Unruh Act was designed to prohibit discrimination by business establishments "in the course of furnishing goods, services, or facilities" to its "clients, patrons, or customers," but does not extend to claims for employment discrimination because other California statutes are specifically tailored to provide relief for such conduct, most notably the FEHA, which was passed by the California Legislature in the very same session as the Unruh Act. *Alcorn*, 2 Cal. 3d at 500.

**[9]** Twenty-six years later in *Strother v. Southern California Permanente Medical Group*, 79 F.3d 859 (9th Cir. 1996), we interpreted the scope of liability available under § 51 in light of *Alcorn* and subsequent California cases and concluded that those precedents established the rule that relief under § 51 was available when the plaintiff was in a relationship with the offending business establishment "similar to that of the customer in the customer-proprietor relationship which the Act and its predecessors have most commonly covered."[2] *Id.* at 874.

---

[2] In *Strother*, we acknowledged that California courts have allowed parties who were "not 'clients, patrons, or customers,' in the traditional sense" to bring claims under § 51. *Id.* at 873. Nevertheless, we determined that the plaintiffs in each of these cases stood in a position with the defendant similar to that of a customer in the "customer-proprietor relationship" the Unruh Act was designed to protect. *Id.* at 873-74 (citing *O'Connor*, 33 Cal. 3d at 796 (holding that condominium owners could bring § 51 claims against their condominium owners' association); *Isbister v. Boys' Club of Santa Cruz, Inc.*, 40 Cal. 3d. 72, 81 (1985) (holding that female children excluded from membership in the Boys' Club could bring claims against the organization); *Jackson v. Superior Court*, 30 Cal. App. 4th 936, 941 (1994) (holding that an African-American investment advisor who accompanied two clients into a bank could assert a § 51 claim alleging discrimination against the bank even though his clients were the actual customers of the bank); *Rotary Club of Duarte v. Bd. of Dirs.*, 178 Cal. App. 3d 1035, 1059 (1987) (holding that a local chapter of the Rotary Club could challenge the National Rotary Club's "male-only" policy under § 51)).

2

**[10]** Applying these precedents, the district court dismissed Johnson's § 51 claims against the defendants, reasoning that his allegations amounted to employment discrimination claims excluded from the Unruh Act's protection. One month later, however, the California Court of Appeal's decision in *Payne v. Anaheim Memorial Hospital*, 130 Cal. App. 4th 729 (2005), became final. In that case, the Third Division of the Court of Appeal held that a physician could assert a § 51 claim against the hospital where he treated patients because that physician did not have the type of employment relationship with the hospital which foreclosed § 51 relief. *Id.* at 748-49. Johnson argues that *Payne* has changed the applicable state law and requires us to reverse the district court's dismissal of his claims.

In reviewing the district court's judgment, we must apply state law as it is presently defined, even if state law has been altered subsequent to the district court's decision. *Vandenbark v. Owens-Illinois Glass Co.*, 311 U.S. 538, 541 (1941); *Nelson v. Brunswick Corp.*, 503 F.2d 376, 381-82 (9th Cir. 1974). In interpreting state law, we are bound to follow the decisions of the state's highest court. *Hewitt v. Joyner*, 940 F.2d 1561, 1565 (9th Cir. 1991). When the state's highest court has not spoken on an issue, we must determine what result the court would reach if we were standing in its shoes by examining "state appellate court opinions, statutes and treatises." *Id.* In undertaking this task, "the California Court of Appeal's announcement of a rule of law 'is a datum for ascertaining state law'" which we may not omit unless we are " 'convinced by other persuasive data that the highest court of the state would decide otherwise.' " *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1012-13 (9th Cir. 2004) (quoting *Hicks v. Feiock*, 485 U.S. 624, 630 n.3 (1988)) (internal quotation marks omitted).

Accordingly, we must first determine whether *Payne*'s holding applies to the facts of this case. If we answer that

question in the affirmative, we must next determine whether there is any persuasive evidence to suggest that the California Supreme Court would have decided *Payne* differently, such that a contrary result would be warranted here.

### 3

Several factual distinctions between Johnson's case and *Payne* are readily apparent. First, Johnson's relationship with Riverside differed from Payne's relationship with his hospital in the material respect that Johnson was compensated while Payne was not. In finding Payne's claims against his hospital cognizable under § 51, the court in *Payne* explained, "Payne does not work for the hospital, and has no obligation to treat his patients there as opposed to any other hospital. Anaheim Memorial does not compensate Payne for his medical services, nor does it exercise any direct control over the manner in which he practices. Instead, the hospital merely provides a facility which a qualified physician may access in connection with providing medical care to his patients." *Payne*, 130 Cal. App. 4th at 748. Riverside, on the other hand, paid Johnson $250 per month to be on call in its emergency room and also compensated him for each trauma patient he treated in an amount not to exceed $10,000 per month.

Second, although Johnson's professional services agreement referred to him as a "contractor," Riverside retained control over all material aspects of his activities at the hospital. While the parties' affiliation did not contain every component of the traditional employer-employee relationship (most notably, Riverside was not required to pay Social Security taxes for Johnson or provide him with retirement benefits), Riverside determined the shifts Johnson was responsible to work, the nurses who would be assigned to work with him, and the credentials it would be necessary for Johnson to display when inside the hospital. Riverside also required Johnson to remain a member in good standing on the Medical Staff.

Thus, we find Johnson's relationship with Riverside distinguishable from the relationship described in *Payne*. Indeed, Johnson's complaint is based solely on allegations of workplace discrimination, not discrimination in the provision of "goods, services, or facilities" prohibited by § 51. On the other hand, we find it quite similar to the relationship we held insufficient to state a § 51 claim in *Strother*. In that case we determined that a physician could not bring a claim under § 51 against the medical group in which she was a partner because her relationship with the group was more akin to that of an employee than that of a "client, patron, or customer" § 51 was designed to protect. *Strother*, 79 F.3d at 863. Although the plaintiff asserted that her relationship with the medical group entitled her to many benefits, such as "the use of certain medical facilities, medical supplies . . . and other goods, management courses, and a variety of privileges, advantages, and services," we concluded that such benefits were no different than those that would be received by a physician employed by the medical group, and thus determined that regardless of whether the plaintiff was a bona fide partner of the group or an employee, because her relationship with the group was analogous to that of an employee, California law precluded her from seeking relief under § 51. *Id.* at 874-75.

**[11]** We continue to follow our decision in *Strother* and conclude that Johnson's § 51 claims are foreclosed by the fact that his relationship with Riverside was materially indistinguishable from that of an employee. We find nothing in the California Court of Appeal's holding in *Payne* to counsel against such a decision because the hospital in that case neither compensated the plaintiff nor controlled the manner of his practice to the degree Riverside does here. Consequently, it is unnecessary for us to decide whether the California Supreme Court would have decided *Payne* differently. California law continues to require a plaintiff asserting a claim under § 51 to demonstrate that his relationship with the offending organization was "similar to that of the customer in

the customer-proprietor relationship." *Id.* at 874. Johnson has made no such demonstration.

## B

**[12]** Johnson has also asserted claims against the defendants under California Civil Code § 51.5. Section 51.5 provides in relevant part:

> No business establishment of any kind whatsoever shall discriminate against, boycott or blacklist, refuse to buy from, contract with, sell to, or trade with any person in this state on account of any characteristics listed or defined in subdivision (b) . . . of Section 51 . . . .

Cal. Civ. Code § 51.5(a). In *Strother* we interpreted § 51.5 as a mere extension of the Unruh Act. 79 F.3d at 875 (citing *Roth v. Rhodes*, 25 Cal. App. 4th 530, 537 (1994)). Explaining that § 51.5, like § 51, is aimed only at discrimination in "relationships similar to the proprietor/customer relationship," we held that § 51.5 required the plaintiff to make the same showing. *Id.* We see no reason to abandon that determination here. Thus, we conclude that a plaintiff asserting claims under § 51.5 must demonstrate that he stands in a relationship with the offending business establishment similar to that of a customer in a customer-proprietor relationship. As explained above, Johnson has failed to do so here. Accordingly, we conclude that his claims under § 51.5 must meet the same fate as his claims under § 51.

## IV

**[13]** Finally, we must determine whether the district court erred in dismissing Johnson's FEHA claims as barred by the statute of limitations. Under California law, a plaintiff who intends to assert a FEHA claim must first file a complaint with the California DFEH, Cal. Gov't. Code § 12960, and

then must file the claims within one year after the DFEH issues a right-to-sue letter for the defendants listed in the complaint, *id.* § 12965(b). Johnson received a right-to-sue letter from the DFEH on September 30, 2002 and timely filed an action in California state court on September 5, 2003. Nevertheless, he voluntarily dismissed that action on October 16, 2003 and then waited until December 2, 2003, 64 days after the limitations period expired, to file this action in federal court. Johnson contends that his timely state court filing satisfies the statute of limitations under theories of equitable estoppel and equitable tolling. We disagree.

[14] Under California law, equitable tolling will be warranted where the defendants have induced the plaintiff to delay filing until after the statute of limitations has run. *See Mills v. Forestex Co.*, 108 Cal. App. 4th 625, 652 (2003) (citation omitted). We discern nothing in the record to suggest that the defendants' conduct caused Johnson to voluntarily dismiss his state court action or wait an additional 47 days before filing this action in federal court.

[15] In addition, California courts have concluded that absent express statutory language, a plaintiff's voluntary dismissal will not entitle him to toll the statute of limitations. *See Wood v. Elling Corp.*, 20 Cal. 3d 353, 359 (1977); *Thomas v. Gilliland*, 95 Cal. App. 4th 427, 433 (2002). Thus, Johnson's voluntary dismissal of his state court action is not an event to which equitable tolling applies.[3]

---

[3]Even if Johnson could demonstrate that he was entitled to equitable tolling, he would not be entitled to toll the period necessary to render his FEHA claim timely. The effect of equitable tolling is that "the limitations period stops running during the tolling event, and begins to run again only when the tolling event has concluded. As a consequence, the tolled interval . . . is tacked onto the end of the limitations period, thus extending the deadline for suit by the entire length of time during which the tolling event previously occurred." *Lantzy v. Centex Homes*, 31 Cal. 4th 363, 370-71 (2003) (emphasis omitted).

V

Based on the foregoing, the district court's dismissal of Johnson's claims against the defendants under § 1981 and under California Civil Code §§ 51 and 51.5 for failure to state a claim upon which relief can be granted and the district court's dismissal of Johnson's FEHA claims for failure to comply with the statute of limitations are

**AFFIRMED.**

---

Johnson filed his state action on September 5, 2003, 25 days before the statute of limitations period expired. He voluntarily dismissed the state action 41 days later, on October 16, 2003. Consequently, if equitable tolling applied, Johnson would have been entitled to file his claims in federal court within 41 days of his voluntary dismissal. Johnson delayed filing until December 2, 2003, however, 47 days after his voluntary dismissal, and 6 days after the maximum tolling period would have expired.