**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HUGH HARDAGE,
       *Plaintiff-Appellant,*

       v.

CBS BROADCASTING INC., a New
York Corporation; VIACOM
TELEVISION STATIONS INC., a
Delaware Corporation; VIACOM
BROADCASTING OF SEATTLE INC., a
Delaware Corporation; KATHY
SPARKS, an individual,
       *Defendants-Appellees.*

No. 03-35906

D.C. No.
CV-02-01303-JCC

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Western District of Washington
John C. Coughenour, Chief Judge, Presiding

Argued and Submitted
May 3, 2005—Seattle, Washington

Filed November 1, 2005
Amended January 6, 2006
Second Amendment February 8, 2006

Before: J. Clifford Wallace, Barry G. Silverman, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Wallace;
Partial Dissent by Judge Paez

1447

**COUNSEL**

Claudia Kilbreath, Short Cressman & Burgess PLLC, Seattle, Washington, for the plaintiff-appellant.

Harry J. F. Korrell and Kathryn S. Loppnow, Davis Wright Tremaine LLP, Seattle, Washington, for the defendants-appellees.

## ORDER

The panel opinion filed January 6, 2006, is amended as follows:

Add as a new paragraph after footnote 1 (slip op. 82):

> There may be circumstances where an employer's "remedial obligation kicks in," *Fuller*, 47 F.3d at 1528, regardless of the employee's stated wishes. In other words, the mere fact that the employee tells the employer not to take any remedial action may not always relieve that employer of the obligation to do so. *See*, *e.g.*, *Torres v. Pisano*, 116 F.3d 625, 639 (2d Cir. 1997). Here, however, it is uncontested that Hardage did not want Falcone to take further action, and that Hardage's wishes were not insincere or uninformed. Moreover, Hardage did not disclose to Falcone the details of the harassment, so Falcone had no way to know of its severity.

The petition for panel rehearing has been previously denied. Judge Silverman votes to deny the Petition for Rehearing En Banc and Judge Wallace so recommends. Judge Paez would grant the petition. The full court has been advised of the Petition for Rehearing En Banc and no judge of the court has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

Appellant's Petition for Rehearing En Banc is therefore DENIED. No further petitions may be filed.

**OPINION**

WALLACE:

The district court entered summary judgment dismissing Hardage's sexual harassment and retaliation claims against CBS Broadcasting Inc., Viacom Television Stations Inc., and Viacom Broadcasting of Seattle Inc. (collectively, CBS), pursuant to Title VII of the 1964 Civil Rights Act and the Washington Law Against Discrimination (WLAD). The district court concluded that CBS was entitled to assert an affirmative defense to liability based on the Supreme Court's decisions in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and it accordingly denied Hardage's motion for partial summary judgment on that issue. In addition, the court declined to exercise supplemental jurisdiction over Hardage's WLAD claims against Kathy Sparks (the alleged harasser) and dismissed those claims without prejudice. *See* 28 U.S.C. § 1367(c). The court also dismissed Hardage's Title VII claims against Sparks with prejudice, and Hardage does not appeal this portion of the court's judgment. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

**I.**

In the summer of 1998, Hardage began working as an advertising account executive for KSTW-TV, a television station owned by Viacom Television Stations, Inc. and managed by CBS Broadcasting Inc. He was promoted to Local Sales Manager in February of 2000, and in this position he worked with another Local Sales Manager, Nadene Stauffer, to manage and supervise the account executives. Both Hardage and Stauffer were supervised by Patty Dean, the General Sales Manager, who was in turn supervised by defendant Sparks, the station's General Manager. Until about a month before Hardage resigned in August of 2001, he worked in the Seattle

sales office whereas Sparks worked in the management office in Tacoma.

Hardage contends he was sexually harassed by Sparks on several occasions and subjected to retaliation after he rejected her advances. He alleges that during Sparks' visits to the Seattle office, she repeatedly flirted with him and made inappropriate comments — such as "[y]ou need somebody that's older and more stable that can take care of you." Leo Elbert, another employee at KSTW, stated that Sparks would "camp out" in Hardage's office, kick back in his chair with her feet on his desk, and smile and giggle in a flirtatious manner. Hardage asserts that he never flirted with Sparks, but that he is a "flirtatious person by nature" and that there was "playful banter from the git-go" with Sparks, some of which he concedes could have been perceived as mutually flirtatious. He has also stated that he referred to Sparks as "Sparkalicious," "Baskin Robbins 32nd Flavor" and "Driving Ms. Sparky." He also agreed in his deposition that his love life in general was "[d]efinitely" part of the "watercooler talk" and "a big topic of conversation around the office."

In addition to the charged workplace harassment, Hardage alleges more serious harassment on five occasions outside of the office. First, on Easter Sunday in 2000, Hardage, Sparks, Dean, Dean's husband, and a few others attended a brunch at the Sorrento Hotel. Hardage believes that he might have been the person who invited Sparks to the event. The group consumed alcoholic beverages and eventually relocated to a sports bar. Hardage drove Sparks in her car. After a few more drinks, Sparks allegedly asked Hardage if her hands were pretty, and then put her foot on an air hockey table while Hardage was playing and asked if he thought she had cute feet. Later, while Hardage was on a skateboard game, Sparks allegedly got up on the skateboard behind him, put her arms around his waist and told him that he had a "cute ass."

After the sports bar, the group went to the Paragon restaurant for dinner and continued drinking alcoholic beverages.

Sparks sat across the table from Hardage and allegedly took off her shoe, slid under the table, and put her foot in Hardage's crotch. At the end of the dinner, many people commented that Sparks was too drunk to drive home, and Sparks asked if she could stay at Hardage's apartment for the night. Hardage declined her request and, according to one witness, Sparks became "livid" and "stormed off" to drive herself home.

The second incident of harassment outside the workplace allegedly occurred two days after the Easter Sunday events. Sparks called Hardage and invited him to the Icon Grill restaurant for drinks after work. At the restaurant, she allegedly told Hardage she had not been able to sleep and "was having orgasms in her sleep." She asked Hardage if he felt the same way about her; Hardage replied that he did not want to damage his career by having a relationship and wanted to go no further than friendship. Hardage asserts that Sparks responded with a snide comment along the lines of, "Don't forget who got you to where you are."

Third, in August of 2000, Hardage and Sparks were both traveling to Texas to visit their respective families. Sparks arranged her travel plans so that she and Hardage sat next to each other on the same flight. Hardage alleges that Sparks took off her shoe and started rubbing her foot on his leg. After he asked her to stop, she began rubbing his back "in a kind of a weird manner." Sparks later referred to Hardage as her boyfriend as she was ordering drinks from a flight attendant, and as they were consuming their drinks, she grabbed his hand and made explicit sexual advances. Hardage contends that she offered him oral sex and told him that one experience of sexual intercourse with her would be life-altering for him. Hardage told her that nothing physical would happen between them.

The fourth incident of alleged harassment occurred in October of 2000, when Hardage and Sparks took some of KSTW's

clients to a baseball game. This is the only alleged instance of harassment outside the workplace that occurred during a work-related event. Hardage and Sparks sat next to each other, and Sparks began rubbing his leg with her foot. Hardage responded, "Kathy, cut it out, you know, we got clients sitting next to us, it's inappropriate." Later, Sparks allegedly took off her rain poncho, put it over Hardage's lap and reached under it for Hardage's crotch. Hardage states he elbowed her hand away and told her to stop.

After the game, Hardage invited Sparks to join him for drinks with his friends at the Pesos bar. Sparks allegedly glared at Hardage while he greeted his friends, including several women, and shouted, "Who haven't you f—ed in here?" Hardage states he pointed to one woman and responded jokingly, "I haven't f—ed anybody in here, you know, but hopefully she's next." Sparks became very upset, asked to be taken back to her car, and shouted obscenities to Hardage. One witness, Leo Elbert, has stated that Sparks told Hardage, "Don't f—ing talk to me. You're finished."

The day after the Pesos incident, Hardage complained to Dean and told her that "[l]ast night, things went way too far" and that Sparks had lost her temper. However, Hardage has stated that he did not tell her "specifics about sexual contact" and never told Dean that Sparks had touched him in an inappropriate way, nor did he share any details of the harassment with anyone else at work.

Hardage also testified that Dean later suggested something "to the effect of . . . 'Why don't you just do it and get it over with. It may put her in a better mood.' " However, when Hardage told Dean about the Pesos incident, Dean promptly contacted Ray Rajewski, an executive vice president, who in turn called Hardage to let him know that he would be contacted by Paul Falcone, a representative from the company's human resources department. Falcone called Hardage the

same day of Hardage's complaint and arranged to meet with him in person the following week.

During their subsequent meeting — which occurred while Hardage drove Falcone to the airport — he did not give Falcone details about the harassment; indeed, he "didn't share any of the so-called gory details with anybody." Instead, he gave Falcone "[j]ust the broad statement . . . that [Sparks] had made . . . unwanted sexual advances that were denied," that he was uncomfortable with the situation, and that Sparks had lost her temper and was "jeopardizing . . . the success of the team." Hardage did not tell Falcone about any of the alleged physical contact or groping by Sparks.

It is also undisputed that although Falcone offered to talk to Sparks and treat Hardage's complaint as an anonymous complaint, Hardage insisted on handling the situation by himself. Hardage explained in his deposition that he did not think the complaint could be handled truly anonymously, because Sparks would know the source, and that he "prided [him]self in handling [his] own business affairs." Approximately two weeks after their meeting, Falcone called Hardage to follow up, and Hardage informed Falcone that nothing new had happened and that he still did not want Falcone to intervene.

In addition to sexual harassment, Hardage contends he was subjected to retaliation. Sparks made snide comments, such as, "your number's up" and, "It's not going to be me that loses my job, it's going to be you."

About the same time, Hardage's performance was called into question. When Hardage and another Local Sales Manager, Stauffer, repeatedly failed to meet sales goals due to a slump in the advertising market, Dean counseled them on several occasions and sent them joint memoranda discussing their performance issues. Furthermore, on August 6, 2001, Dean sent Hardage a memorandum which cited problems with his work performance, including his insubordination in failing to

return to work after attending a charity event. Hardage has conceded that he had in fact been insubordinate. The memorandum indicated that Hardage and Dean would have a formal meeting to reevaluate his performance in approximately thirty days, and it warned that a "[f]ailure to see significant improvement could result in [his] termination."

On August 31, 2001, Hardage submitted his letter of resignation. He testified that adverse market conditions had created a "pretty intense environment" and had "deflated [him] to the point that . . . was the end of [his] rope."

## II.

Hardage asserts Title VII and WLAD claims of sexual harassment and retaliation against CBS. "Washington's Law Against Discrimination tracks federal law, and thus our analysis will cite only federal law," but our analysis applies with equal force to Hardage's WLAD claims against CBS. *Anderson v. Pac. Mar. Ass'n*, 336 F.3d 924, 925 n.1 (9th Cir. 2003), *citing Payne v. Children's Home Soc'y, Inc.*, 892 P.2d 1102, 1105-06 (Wash. Ct. App. 1995); *see also Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 966, 969 (9th Cir. 2002) (Washington courts look to federal law when considering sex discrimination and retaliation claims).

We review the district court's summary judgment de novo to determine whether, viewing the evidence in the light most favorable to the non-moving party, there are any genuine issues of material fact and whether the district court correctly applied relevant substantive law. *Kohler v. Inter-Tel Techs.*, 244 F.3d 1167, 1171 (9th Cir. 2001). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).

## III.

**[1]** Title VII provides that it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). This anti-discrimination principle is violated when sexual harassment is sufficiently severe or pervasive to "alter the conditions of [the victim's] employment and create an abusive working environment." *Montero v. AGCO Corp.*, 192 F.3d 856, 860 (9th Cir. 1999) (alteration in original), *quoting Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986), *quoting Henson v. Dundee*, 682 F.2d 897, 904 (11th Cir. 1982).

**[2]** An employer is vicariously liable "for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Id.* at 861. However, the Supreme Court has established an affirmative defense to vicarious liability:

> When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, *see* Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. . . . No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807-08. Thus, even if we assume that Hardage was sexually harassed, CBS

can avoid liability if it can show that (1) it took no "tangible employment action" against Hardage, (2) it exercised reasonable care to prevent and correct harassment, and (3) Hardage unreasonably failed to take advantage of preventive or corrective opportunities. We must determine whether, even viewing the evidence in the light most favorable to Hardage, he has failed to raise a triable factual issue as to each element of this defense, thus entitling CBS to summary judgment.

## A.

**[3]** A "tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761. A tangible employment action "requires an official act of the enterprise, a company act," and "in most cases inflicts direct economic harm." *Id.* at 762.

While employed at KSTW-TV, Hardage never experienced any decrease in compensation, hours, title, duties or benefits. He contends, however, that he was constructively discharged as a result of a hostile work environment, and this constructive discharge constitutes a tangible employment action. *See Pa. State Police v. Suders*, 542 U.S. 129, 124 S. Ct. 2342, 2351 (2004) (holding that constructive discharge precipitated by a supervisor's official act can constitute a "tangible employment action"). He cites the sexual harassment by Sparks as well as allegedly retaliatory actions — namely, the adverse performance memoranda he and Stauffer received, Sparks' snide remarks, and the August 6, 2001 memorandum warning Hardage that his performance would be reevaluated after a thirty-day period. He contends that after "enduring the severe and pervasive harassment . . . and retaliation," he "finally came to the conclusion that CBS would not take his complaints seriously" and saw "no way out" but to resign. He also argues he was constructively discharged by being placed

on "the same kind of probation under which [he] had seen other employees consistently lose their jobs."

**[4]** These arguments miss the mark. In order to survive summary judgment on a constructive discharge claim, a plaintiff "must show there are triable issues of fact as to whether 'a reasonable person in [his] position would have felt that [he] was forced to quit because of intolerable and discriminatory working conditions." *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465 (9th Cir. 1994); *see also Suders*, 124 S. Ct. at 2347. In *Montero*, 192 F.3d at 861, we held that the plaintiff was not constructively discharged in part because the sexually harassing behavior had ceased three to four months before the plaintiff's resignation. *See also Steiner*, 25 F.3d at 1465-66; *Manatt v. Bank of Am., NA*, 339 F.3d 792, 804 (9th Cir. 2003). Hardage concedes that the last time Sparks made inappropriate sexual advances or comments was in March of 2001, yet he did not resign until five months later, on August 31, 2001. As a result, even if Sparks' sexual harassment created a hostile work environment, such harassment ceased well in advance of Hardage's resignation.

**[5]** Nor do the allegedly retaliatory actions taken against Hardage amount to a constructive discharge. CBS has proffered legitimate, non-retaliatory reasons for the adverse performance memoranda, which were addressed to *both* Hardage and Stauffer. *See Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000) ("[C]onstructive discharge occurs when the working conditions deteriorate, *as a result of discrimination*, to the point that they become 'sufficiently extraordinary and egregious' " (citation omitted) (emphasis added)). Indeed, it is undisputed that Hardage was insubordinate and failed to meet sales goals in his last few months as a Local Sales Manager.

**[6]** For this reason, even if we consider the memoranda as tangible employment actions in and of themselves, rather than as components of a constructive discharge, they do not bar

CBS from asserting the *Ellerth/Faragher* defense. *See Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 959 (9th Cir. 2004) ("[E]ven if a tangible employment action occurred, an employer may still assert the affirmative defense if the tangible employment action 'was unrelated to any harassment or complaint thereof' " (quoting *Nichols v. Azteca Rest. Enter., Inc.*, 256 F.3d 864, 877 (9th Cir. 2001))); *Kohler*, 244 F.3d at 1180 ("Kohler cannot connect any of the alleged employment actions she experienced to her rejection of [her supervisor]'s advances. Therefore, Kohler has failed to demonstrate a disputed factual issue as to whether she suffered a tangible employment action").

**[7]** As for the allegedly snide remarks, the Supreme Court has emphasized that only a constructive discharge which is precipitated by an "official act" can constitute a "tangible employment action." *Suders*, 124 S. Ct. at 2355. An official act is " 'the means by which the supervisor brings the official power of the enterprise to bear on subordinates.' " *Id.* at 2353, *quoting Ellerth*, 524 U.S. at 762. Sparks' occasional comments clearly are insufficient under this standard. Thus, Hardage has failed to establish a material factual dispute as to whether he was constructively discharged, and he has not alleged any other "tangible employment action."

## B.

In order to assert the *Ellerth/Faragher* defense successfully, CBS must have "exercise[d] reasonable care to prevent and correct promptly any sexually harassing behavior." *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807. In *Kohler*, 244 F.3d at 1180-81, we construed this standard to require both preventive and remedial measures.

**[8]** As for the former, we held that an employer's adoption of an anti-harassment "policy and its efforts to disseminate the policy to its employees establish that [the employer] exercised reasonable care to prevent sexual harassment in the

workplace." *Id.* at 1180; *see also Ellerth*, 524 U.S. at 765. In this case, it is undisputed that CBS has an anti-harassment policy, with which Hardage had familiarity. As a supervisor, he was responsible for reporting sexual harassment to the human resources department, and he understood that sexual harassment was prohibited. Thus, CBS fulfilled its duty to take *preventive* measures as a matter of law by adopting and promoting awareness of its anti-harassment policy.

In addition, however, CBS must have taken steps to *correct* Hardage's particular situation promptly. *See Kohler*, 244 F.3d at 1181 ("The [reasonable care] prong of the affirmative defense also requires [the employer] to demonstrate that it exercised reasonable care to promptly correct sexually harassing behavior"); *see also Montero*, 192 F.3d at 862. After Hardage complained to Dean in October 2000, Dean immediately contacted Rajewski, who in turn notified Falcone. Falcone called Hardage the same day he made his complaint, and shortly thereafter, they met in Seattle. At their meeting, Falcone discussed Hardage's options. Hardage asserted that he wanted to "handle it by [him]self." Approximately two weeks later, Falcone followed up with Hardage by telephone, and Hardage indicated that he still did not want Falcone to intervene. This would appear to end any debate on this issue, but Hardage makes two arguments as to why there is a triable factual dispute regarding this requirement.

**[9]** First, he emphasizes Falcone's "inexplicabl[e]" failure to investigate his complaint or discipline Sparks. In *Swenson v. Potter*, 271 F.3d 1184 (9th Cir. 2001), we explained that "[n]otice of the sexually harassing conduct triggers an employer's duty to take prompt corrective action that is 'reasonably calculated to end the harassment.' " *Id.* at 1192 (citations omitted). "The reasonableness of the remedy depends on its ability to: (1) 'stop harassment by the person who engaged in harassment;' and (2) 'persuade potential harassers to refrain from unlawful conduct.' " *Nichols*, 256 F.3d at 875. Although an "investigation is a key step," *Swenson*, 271 F.3d at 1193,

we "consider the overall picture" to determine whether the employer's response was appropriate. *Id.* at 1197.

To be sure, CBS's anti-harassment policy states that "[f]ollowing a complaint, a thorough investigation will be made" and the "matter will be handled in the *strictest of confidence*." Hardage was convinced, however, that there was "absolutely no way that [his complaint] could be handled anonymously," and he therefore told Falcone he wanted to handle the situation by himself. Indeed, he stated that when Sparks later mentioned the words "sexual harassment" to him, he "felt like [his] trust had been possibly violated by corporate and — leaking information, because [he had] stated [he] wanted to handle the case on [his] own."

**[10]** In addition, although Hardage did put CBS on notice of Sparks' "unwanted sexual advances," he did not tell Falcone the "gory details" or apprise Dean of the "specifics about sexual contact." Instead, he was vague about the extent and nature of Sparks' advances. Thus, even if a more thorough investigation and disciplinary measures for the harasser could in some circumstances be essential in spite of a harassed employee's request to handle the situation, there can be no such duty in this case. *See Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991) ("[R]emedies should be 'assessed proportionately to the seriousness of the offense' "); *cf. Nichols*, 256 F.3d at 870-71 (employer failed to meet remedial obligations after employee "reported and described the specifics of the harassment" to a human resources director, and "expressed concern that the harassment would continue to be ignored"). Dean's alleged comment to Hardage that "Why don't you just do it and get it over with. It may put her in a better mood" is certainly troubling. However, it cannot singularly serve to transform CBS's response into an unreasonable one, nor can it erase the legal significance of his specific request not to investigate his admittedly minimal and vague complaint. Con-

sidering the "overall picture," CBS's response was both prompt and reasonable as a matter of law.[1]

There may be circumstances where an employer's "remedial obligation kicks in," *Fuller*, 47 F.3d at 1528, regardless of the employee's stated wishes. In other words, the mere fact that the employee tells the employer not to take any remedial action may not always relieve that employer of the obligation to do so. *See*, *e.g.*, *Torres v. Pisano*, 116 F.3d 625, 639 (2d Cir. 1997). Here, however, it is uncontested that Hardage did not want Falcone to take further action, and that Hardage's wishes were not insincere or uninformed. Moreover, Hardage

---

[1]The dissent accuses us of "depart[ing] from well-settled case law requiring an employer to conduct an investigation and take prompt corrective action once it is on notice of alleged harassment." This "well-settled case law" appears to consist of a single out-of-circuit case, *Malik v. Carrier Corp.*, 202 F.3d 97 (2d Cir. 2000). *Malik*, however, addressed a significantly different legal context.

In *Malik*, the Second Circuit considered state law claims by a man accused of harassment. Malik filed suit for negligent infliction of emotional distress and negligent misrepresentation arising out of the investigation of complaints against him. 202 F.3d at 99. Malik's accusers never requested that their complaints not be investigated. *See id.* at 100-02. Thus *Malik* bears little resemblance to the present action and the quoted language is at best dicta from another circuit.

There is thus no precedent to support the dissent's claim (at 1475) that "even if a complainant requests that the employer take no action, an employer still must fulfill its duty" to investigate the complaint. It is therefore the dissent that would "depart from well-settled" precedent by requiring an investigation in all circumstances no matter how strenuously or repeatedly the alleged victim asked the company to forego investigation.

The dissent also analyzes the potential legal effect of EEOC enforcement guidance. This guidance was never cited by Hardage in any of his briefs. "Our circuit has repeatedly admonished that we cannot 'manufacture arguments for an appellant' and therefore we will not consider any claims that were not actually argued in appellant's opening brief." *Indep. Towers v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003), *quoting Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994). For that reason, we will not manufacture an argument on Hardage's behalf and then rule on it in his favor. This argument was waived. *See Greenwood*, 28 F.3d at 977.

did not disclose to Falcone the details of the harassment, so Falcone had no way to know of its severity.

Alternatively, Hardage contends there is a triable factual dispute as to whether CBS was on notice prior to his complaint to Dean in October of 2000. He alleges that he made "numerous complaints" to Dean and repeatedly told her he did not want to be left alone with Sparks. Yet when counsel for CBS asked Hardage during his deposition to state every time he could recall speaking to Dean about Sparks' behavior, Hardage vaguely suggested a barbeque event and a concert at the Mercer Coliseum, but he could not remember the dates or what he told Dean about why he did not want to attend the events. Hardage recalled that he may have told Dean he did not want to be alone with Sparks — which Hardage asserts was "an ongoing joke" — but such a statement would hardly have given Dean notice of ongoing sexual harassment. Even drawing all reasonable inferences in favor of Hardage, these undetailed allegations are "merely colorable" and insignificantly probative to create a genuine factual dispute about whether CBS's response was reasonable. *See Anderson*, 477 U.S. at 249-50; *see also McPherson v. City of Waukegan*, 379 F.3d 430, 441 n.7 (7th Cir. 2004) (" 'When . . . the only possible source of notice to the employer . . . is the employee who is being harassed, she cannot withstand summary judgment without presenting evidence that she gave the employer enough information to make a reasonable employer think there was some probability that she was being sexually harassed.' " (*quoting Zimmerman v. Cook County Sheriff's Dep't*, 96 F.3d 1017, 1019 (7th Cir. 1996))).

Hardage also argues that CBS was on notice of the harassment because Dean personally observed some of Sparks' harassing behavior. Yet, Hardage has stated that Dean also witnessed "some flirtation," and he concedes that the mutual "banter" between Sparks and him could have been perceived as flirtatious. Taken in context, Dean did not unreasonably

fail to report the incident to CBS management, thereby triggering CBS's duty to remedy the situation promptly.

In addition, Hardage suggests Dean "had the opportunity to observe the harassment on a daily basis in the workplace." However, until July 2001 — approximately ten months after Hardage complained to Dean in October 2000 — Hardage worked in Seattle and Sparks worked in Tacoma. Accordingly, Dean had limited opportunities to observe Hardage and Sparks together. Furthermore, given Hardage's playful names for Sparks such as "Sparkalicious" and their "playful banter from the git-go," his repeated invitations to Sparks to socialize with him outside of work, and his failure to inform Dean that Sparks' flirtations were unwelcome harassment, Dean did not unreasonably fail to report any flirtatious behavior by Sparks when she was visiting the Seattle office.

## C.

**[11]** We now turn to the third *Ellerth/Faragher* requirement: that Hardage unreasonably failed to take advantage of preventive or corrective opportunities. As a local sales manager in charge of supervising approximately ten employees, Hardage was well aware of CBS's anti-harassment policy and the procedure for initiating a complaint. Indeed, he testified he understood that "all actual sexual harassment in [his] workplace [was] dealt with in a serious manner." He contends that he "informally and formally reported the harassment on several occasions," and therefore he did not unreasonably fail to make use of remedial and preventive opportunities.

**[12]** Yet, although Hardage contends the harassment commenced in April 2000, his first complaint to Dean that he has identified with specificity was in October 2000 — approximately half a year later. "[W]hile proof that an employee failed to fulfill the . . . obligation of reasonable care to avoid harm is not limited to showing any unreasonable failure to use any complaint procedure provided by the employer, a demon-

stration of such failure will normally suffice to satisfy the employer's burden under [this] element of the defense." *Ellerth*, 524 U.S. at 765; *Faragher*, 124 U.S. at 807-08; *see also Suder*, 124 S. Ct. at 2354 (the *Ellerth/Faragher* defense requires "plaintiffs reasonably to stave off avoidable harm"); *Kohler*, 244 F.3d at 1181-82. In addition to waiting half a year to make a complaint, when Hardage finally made his complaint he specifically asked the company not to investigate it. By specifically requesting the company not make use of its remedial and preventative procedures, Hardage unreasonably failed to make use of CBS's anti-harassment policies and procedures.

[13] Thus, Hardage has failed to establish a material factual dispute regarding any of the three elements of CBS's affirmative defense. The district court properly entered summary judgment for CBS and denied partial summary judgment for Hardage on his sexual harassment claim.

## IV.

[14] Title VII prohibits retaliation against an employee for opposing unlawful discrimination. 42 U.S.C. § 2000e-3(a). To make out a prima facie case of retaliation, Hardage must show that (1) he engaged in a protected activity, such as the filing of a complaint alleging sexual harassment; (2) CBS subjected him to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action. *See Manatt*, 339 F.3d at 800, *quoting Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000); *Brooks*, 229 F.3d at 928. If Hardage makes a prima facie case, the burden shifts to CBS to articulate a legitimate, nondiscriminatory reason for the adverse action, and Hardage then bears the ultimate burden of demonstrating that this reason is pretextual. *Manatt*, 339 F.3d at 800.

[15] Hardage contends he was subjected to retaliation in the form of adverse performance memoranda and being placed on

a thirty-day probation period. In *Ray*, we recognized that "*undeserved* performance ratings, *if proven*, would constitute 'adverse employment decisions.' " 217 F.3d at 1241 (emphasis added), *quoting Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987). Here, by contrast, it is undisputed that Hardage failed to meet sales goals and disobeyed Dean's instruction that he return to work after a charity event. Hardage therefore failed to prove a causal link between the memoranda and Hardage's sexual harassment complaint. Furthermore, even if we assume that Hardage has established a prima facie case, we conclude he has failed to rebut CBS's legitimate reasons for the memoranda. *See Manatt*, 339 F.3d at 801. Moreover, except for the August 6 memorandum addressing Hardage's insubordination, Stauffer received the same performance memoranda. "Absent a showing of disparate treatment, the [employer's action] cannot be deemed retaliatory." *Brooks*, 229 F.3d at 929.

In addition, Hardage asserts that Sparks retaliated by making "snide remarks" and threats, such as "your number's up" and "don't forget who got you where you are." However, we have held that "only non-trivial employment actions that would deter reasonable employees from complaining about Title VII violations will constitute actionable retaliation." In *Kortan v. California Youth Authority*, 217 F.3d 1104, 1112 (9th Cir. 2000), we held that a supervisor's laughing and stating that the plaintiff "got him on sexual harassment charges," the supervisor's hostile stares, and increased criticism were insufficient to preclude summary judgment dismissing the plaintiff's retaliation claim. *See also Brooks*, 229 F.3d at 929 (stating that badmouthing an employee outside the job reference context does not constitute adverse employment action); *Manatt*, 339 F.3d at 803 ("Mere ostracism in the workplace is not grounds for a retaliation claim . . . ."); *cf. Ray*, 217 F.3d at 1243 (definition of "adverse employment action" "does not cover every offensive utterance by co-workers, because offensive statements by co-workers do not reasonably deter employees from engaging in protected activity").

Moreover, even if Sparks' remarks collectively created a hostile work environment that constituted retaliation, such harassment "is actionable only if it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Ray*, 217 F.3d at 1245. *quoting Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). Considering the totality of circumstances, we hold that Sparks' comments are insufficiently severe to support a retaliation claim. *See Faragher*, 524 U.S. at 788 (" '[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.' " (citation omitted)).

## V.

**[16]** Because Hardage appeals from the district court's dismissal of his state WLAD claims against Sparks only by arguing they should be reinstated if summary judgment for CBS is reversed, we affirm the district court's dismissal of this claim as well. *See* 28 U.S.C. § 1367(c); *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997) (en banc) (" '[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims' " (omission in original) (*quoting Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988))).

**AFFIRMED.**

---

PAEZ, Circuit Judge, dissenting in part:

I agree that the district court properly granted summary judgment on Hardage's constructive discharge and retaliation claims, and that Hardage did not raise a triable issue of fact as to whether he suffered a tangible employment action. I can-

not agree, however, with the majority's conclusion that CBS established as a matter of law the *Faragher/Ellerth* defense to vicarious liability for Sparks' sexual harassment. In reaching its conclusion, the majority departs from well-settled case law requiring an employer to conduct an investigation and take prompt corrective action once it is on notice of alleged harassment. Because a reasonable jury readily could find that CBS is vicariously liable for sexual harassment, I would reverse the grant of summary judgment and remand for a trial. Accordingly, I dissent from Parts III.B and III.C of the majority's opinion.

To establish the *Faragher/Ellerth* affirmative defense, an employer must prove by a preponderance of the evidence two necessary elements:

> (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998). An employer is not entitled to summary judgment on this issue unless there are *no* genuine disputes of material fact as to either element of the defense. That is, summary judgment must be denied if a rational jury could conclude *either* that (1) the employer failed to exercise reasonable care to prevent and promptly correct any sexually harassing behavior, *or* that (2) the employee did not unreasonably fail to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Here, the record reveals genuine factual disputes as to both elements.

## 1. Whether CBS Acted Reasonably to Prevent and Correct the Harassment

It is well-established that "[n]otice of the sexually harassing conduct triggers an employer's duty to take prompt corrective action that is reasonably calculated to end the harassment." *Swenson v. Potter*, 271 F.3d 1184, 1192 (9th Cir. 2001) (internal quotation marks omitted). The reasonableness of the remedy depends on the employee's ability to stop the harassment and to deter potential harassers, as well as the promptness of the response. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1120 (9th Cir. 2004). Once an employer is on notice of a sexual harassment complaint, it *must* conduct an investigation. *Swenson*, 271 F.3d at 1193. An employer's remedial "obligation actually has two parts. The first consists of the temporary steps the employer takes to deal with the situation while it determines whether the complaint is justified. The second consists of the permanent remedial steps the employer takes once it has completed its investigation." *Id.* at 1192.

Contrary to our case law, the majority holds that an employer's response to a harassment complaint may be deemed reasonable as a matter of law even though the employer conducted *no* investigation and took *no* action to address the harassing behavior. The majority relies on our statement in *Swenson* that "we consider the overall picture" in determining the adequacy of the employer's response to a harassment complaint. *Id.* at 1197. In *Swenson*, however, we never suggested that an investigation was not required. In fact, we specifically stressed the importance of an investigation, stating:

> The most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified. An investigation is a key step in the employer's response, and can itself be a powerful factor in deter-

> ring future harassment. By opening a sexual harassment investigation, an employer puts all employees on notice that it takes such allegations seriously and will not tolerate harassment in the workplace. An investigation is a warning, not by words but by action.

*Id.* at 1193 (citation omitted).

In *Swenson*, we held that the investigation conducted by the employer was competent. We noted, however, that even if the investigation were "less than perfect," the employer's response was reasonable in light of the "overall picture," *id.* at 1197, which included the fact that the employer immediately warned the harasser that his conduct was sexual harassment and ordered him to keep away from the complainant, promptly separated him from the complainant pending the outcome of the investigation, and the harassment stopped as a result of the employer's intervention. *Id.* at 1192-98. We did not hold, nor have we ever held, that an employer may be deemed to have reasonably responded to a harassment complaint when it altogether fails to conduct an investigation. Indeed, we have stated that "the 'fact of investigation alone' is not enough. An investigation that is rigged to reach a predetermined conclusion or otherwise conducted in bad faith will not satisfy the employer's remedial obligation." *Id.* at 1193 (quoting *Fuller v. City of Oakland*, 47 F.3d 1522, 1529 (9th Cir. 1995)).

Here, the majority acknowledges that Hardage told CBS's human resources representative, Ray Falcone, that Sparks had made " 'unwanted sexual advances.' " Maj. op. at 1457. Yet, Falcone conducted *no* investigation and took *no* corrective action. Nor did he even inform Sparks that a complaint had been made, much less discipline her.[1] Nonetheless, the major-

---

[1] Falcone testified in his deposition as follows:

ity concludes as a matter of law that CBS exercised reasonable care to correct Sparks' harassment. The majority relies on two facts: Hardage told Falcone he would handle the matter himself, and Hardage did not offer Falcone specific details about Sparks' sexually harassing behavior. Maj. op. at 1464. Neither is a valid reason for absolving CBS of its duty to investigate and correct Sparks' harassment.

First, a harassment complainant's request that an employer take no action does not relieve the employer of its obligation under the law to investigate and remedy the harassing conduct. The Equal Employment Opportunity Commission's ("EEOC") Enforcement Guidance on Vicarious Liability for Supervisor Harassment speaks precisely to this point:

> A conflict between an employee's desire for confidentiality and the employer's duty to investigate may

---

Q: "Just to confirm, . . . based on your conversation with Mr. Hardage, you didn't conduct any investigation —

A: Correct.

Q: — of these claims?

A: Yes.

Q: And I take it that Ms. Sparks was never disciplined in any way?

A: No. I never even — my recommendation to Ray Rajewski was that it didn't even need to be brought to Kathy Sparks' attention.

Further, Patty Dean testified:

Q: Did Mr. Falcone ever contact you or interview you in any way regarding Mr. Hardage's complaints about Ms. Sparks?

A: No, I believe not.

Q: Okay. Did anyone at KSTW or CBS, the broader entity, ever contact you, ask you any questions, interview you, anything of that kind regarding Mr. Hardage's complaints about Ms. Sparks?

A. No.

arise if an employee informs a supervisor about alleged harassment, but asks him or her to keep the matter confidential and take no action. Inaction by the supervisor in such circumstances could lead to employer liability. While it may seem reasonable to let the employee determine whether to pursue a complaint, the employer must discharge its duty to prevent and correct harassment.

EEOC Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors, § V.C.1.d, No. 915.002 (June 18, 1999) [hereinafter EEOC Enforcement Guidance].[2] This same concern was expressed by the Second Circuit in *Malik v. Carrier Corp.*, 202 F.3d 97, 105-06 (2d Cir. 2000). Although addressing slightly different circumstances, the Second Circuit in *Malik* noted the importance of an employer's investigation of sexual harassment complaints, even when the victim employee desires to drop the matter:

> [A]n employer's investigation of a sexual harassment complaint is not a gratuitous or optional undertaking; under federal law, an employer's failure to investigate may allow a jury to impose liability on the employer. . . . Nor is the company's duty to investigate subordinated to the victim's desire to let the matter drop. Prudent employers will compel harassing employees to cease all such conduct and will not, even at a victim's request, tolerate inappropriate conduct that may, if not halted immediately, create a hostile environment.

Thus, contrary to the majority's holding, even if a complainant requests that the employer take no action, an employer still must fulfill its duty to prevent and correct the alleged harassment.

---

[2]We have held that the EEOC's interpretations of Title VII as expressed in this Enforcement Guidance "are entitled to respect." *Holly D. v. Cal. Inst. of Tech.*, 339 F.3d 1158, 1172 (9th Cir. 2003).

Moreover, while the majority purports to consider the "overall picture," its account of CBS's response to Hardage's complaint ignores critical facts indicating that CBS failed to act reasonably. The majority's summary of these events is brief: "[A]lthough Falcone offered to talk to Sparks and treat Hardage's complaint as an anonymous complaint, Hardage insisted on handling the situation by himself." Maj. op. at 1476. This account leaves out key aspects of Hardage's discussion with Falcone. After Hardage told Falcone that Sparks had made unwanted sexual advances, Falcone asked Hardage, "What would you like me to do?" In response, Hardage said he "really d[id]n't know," and asked, "What are my options? How do you usually handle these things?" Falcone testified that he then told Hardage he had three choices: (1) Hardage could "do absolutely nothing and hope it solves itself," (2) Hardage could talk to Sparks on his own, or (3) Falcone could "very nicely talk with" Sparks and ask her to "just lay back on this a little bit," but he assured Hardage he would not "yell at her and get her in trouble."

Notably, not one of these options fulfilled CBS's legal duty to investigate and correct the harassing behavior. The first two options flouted CBS's obligation to take prompt corrective action. *See Fuller*, 47 F.3d at 1529 ("[I]naction [cannot] fairly be said to qualify as a remedy 'reasonably calculated to end the harassment.' Title VII does not permit employers to stand idly by once they learn that sexual harassment has occurred. To do so amounts to ratification of the prior harassment." (citation omitted)). The second option also inappropriately put the burden on Hardage to correct the harassment. *See Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 876 (9th Cir. 2001) (holding that an employer unreasonably responded to a harassment complaint when it "placed virtually all of its remedial burden on the victimized employee"). Finally, the third option—the only one proposing any action by CBS at all—improperly included a guarantee that CBS would not discipline Sparks in any way. *See McGinest*, 360 F.3d at 1120

("Remedial measures must include some form of disciplinary action.").

It was only *after* Falcone presented these three legally inadequate options that Hardage said he would handle the situation himself. Even if an employer could be relieved of its duty to investigate and correct harassing behavior by virtue of a complainant's request to address it on his own—which it cannot—this certainly cannot be true where, as here, "the overall picture" reveals that CBS affirmatively misled Hardage about its own legal duty and offered him no meaningful alternative to handling the situation on his own. An employer may not shield itself from liability by erroneously telling a complainant that doing "absolutely nothing" is a valid response to harassment, and then justifying its inaction by stating it was merely respecting the employee's "choice."

Second, the majority incorrectly holds that "there can be no duty" to investigate or correct harassment where an employee fails to offer specific details of the harassing behavior in the course of making his initial complaint. The majority notes that Hardage said he "did not tell [Dean] 'specifics about sexual contact' " and did not tell Falcone the " 'gory details' " of Sparks' behavior. Maj. op. at 1464. The majority, however, acknowledges that "Hardage did put CBS on notice of Sparks' 'unwanted sexual advances.' "[3] *Id*. This is all that is required to trigger CBS's duty to investigate and correct the harassment.

There is simply no authority for the proposition that an employer who is on notice of unwanted sexual advances is relieved of the duty to investigate and take corrective action merely because the employee did not *volunteer* the details of

---

[3]Indeed, Hardage testified that he told both Dean and Falcone that Sparks had made unwanted sexual advances, and Dean herself testified that she understood that Hardage was complaining about sexual harassment.

the harassing conduct during his initial complaint to the employer, especially where—as here—the employer *never asked* for specifics. The very point of an investigation is to gather the details about the alleged harassment. *See* EEOC Enforcement Guidance § V.C.1.e.i (providing examples of appropriate questions to ask the complainant during an investigation, including, "Who, what, when, where, and how: *Who* committed the alleged harassment? *What* exactly occurred or was said? *When* did it occur and is it still ongoing? *Where* did it occur? *How often* did it occur? *How* did it affect you?").

To support its conclusion that an employer has no duty to investigate where the complainant is "vague about the extent and nature" of a supervisor's sexual advances, the majority cites *Ellison v. Brady*, where we held that "remedies should be assessed proportionately to the seriousness of the offense." 924 F.2d 872, 882 (9th Cir. 1991) (internal quotations omitted). In *Ellison*, however, we did not suggest that an investigation is a remedy that may or may not be imposed depending on the seriousness of the offense; indeed, there, the employer promptly investigated the complaint and requested that the harasser refrain from discriminatory conduct, yet we held that there was a genuine dispute of fact regarding the reasonableness of the remedy. *Id.* at 882-83. As we have made clear, "an investigation is principally a way to determine whether any remedy is needed and cannot substitute for the remedy itself." *Fuller*, 47 F.3d at 1529.

The majority also cites *Nichols*, where we stated that the complainant had reported "the specifics of the harassment." 256 F.3d at 870. In *Nichols*, however, we noted this fact in the context of holding that the district court clearly erred in finding that the complainant had not reported the harassment at all and in support of our conclusion that the complainant subjectively perceived his workplace to be hostile. *Id.* at 873 ("Sanchez told Serna, in considerable detail, about the fact and nature of the verbal abuse. Sanchez also complained to the Southcenter general manager and an assistant manager,

though in less detail. It was clearly erroneous to find, as did the district court, that Sanchez had not complained about his harassment. . . . That Sanchez complained about the frequent, degrading verbal abuse supports our conclusion that the conduct was unwelcome").

Moreover, *Nichols* actually undermines the majority's conclusion. There, we noted that the plaintiff's complaints did not comply with the formal reporting requirements of the employer's anti-harassment policy; nonetheless, we held that the plaintiff's complaints "were sufficient to place the company on notice of the harassment." 256 F.3d at 876 n.10. Because the employer did nothing to investigate or remedy the harassment despite this notice, we held that the employer did not exercise reasonable care and could not assert the affirmative defense to vicarious liability. *Id.* at 877. As in *Nichols*, the critical point here is that CBS was on notice of Sparks' unwanted sexual advances, yet failed to investigate or remedy the harassment.

Notice of Sparks' unwanted sexual advances triggered CBS's duty to investigate and take steps reasonably calculated to end the harassment. CBS's inaction in the face of Hardage's complaint not only violated its legal duty, it also violated its own written policy on sexual harassment. This policy states:

> Following a complaint, a thorough investigation will be made by interviewing the individual(s) allegedly responsible for the harassment, and any witnesses. After the investigation, should it be determined that the allegations are true, then appropriate action will be taken, including, but not limited to, written reprimand, warning, suspension, demotion, or dismissal.

As noted, CBS admittedly never conducted an investigation of Hardage's complaint and never took any disciplinary action against Sparks. Indeed, Falcone testified that his "recommen-

dation . . . was that it didn't even need to be brought to Kathy Sparks' attention." On this record, a rational trier of fact readily could conclude that CBS failed to exercise reasonable care to correct Sparks' harassing behavior. *See Fuller*, 47 F.3d at 1529 ("An employer whose sole action is to conclude that no harassment occurred cannot in any meaningful sense be said to have 'remedied' what happened.").

The majority's contrary conclusion marks a dramatic departure from our case law establishing that an employer breaches its duty of reasonable care when it fails to adequately investigate, and take steps to correct, harassing conduct. *See Nichols*, 256 F.3d at 876-88 (holding that employer did not exercise reasonable care to promptly correct sexually harassing behavior where it "made no effort to investigate Sanchez's complaint; it did not discuss his allegations with the perpetrators; it did not demand that the unwelcome conduct cease; and it did not threaten more serious discipline in the event the harassment continued"); *Fuller*, 47 F.3d at 1529 (holding that employer could not be shielded from liability for sexual harassment where its investigation was inadequate, its offer to transfer victim improperly targeted the victim rather than the harasser, and the employer "failed to take *any* appropriate remedial steps once it learned of the harassment"); *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464 (9th Cir. 1994) (reversing grant of summary judgment in favor of employer on vicarious liability where employer "was consistently slow to react to Steiner's claims, and did not seriously investigate them or strongly reprimand" the harasser until after Steiner filed a complaint with the state equal rights commission); *Ellison*, 924 F.2d at 882 (holding that genuine issues of fact precluded summary judgment for the employer even though it "promptly investigated" the harassment allegation, where it "did not express strong disapproval of Gray's conduct, did not reprimand Gray, did not put him on probation, and did not inform him that repeated harassment would result in suspension or termination").

CBS's conduct here is a far cry from actions that we have held fulfilled an employer's duty of reasonable care. For example, in *Kohler v. Inter-Tel Tech.*, 244 F.3d 1167, 1181 (9th Cir. 2001)—where we stated that the facts "present a paradigm of the 'reasonable efforts' the Supreme Court sought to encourage when it established the affirmative defense"—the employer "responded by promptly hiring a neutral third party to investigate Kohler's allegations," and even though the investigator did not confirm the harassment claim, the employer nonetheless reviewed its antiharassment policy with the alleged harasser, reprimanded him for his behavior, and conducted mandatory sexual harassment trainings for the entire workforce. *Id.*; *see also Holly D.*, 339 F.3d at 1177-78 (holding that employer acted reasonably as a matter of law where it "promptly convened an investigatory committee, which impartially interviewed every witness" suggested by the complainant and the alleged harasser; the employer reminded the harasser of its sexual harassment policy despite an initial determination that there was insufficient evidence of harassment; and once evidence came to light substantiating the victim's complaint, the employer asked the harasser to resign); *Montero v. Agco Corp.*, 192 F.3d 856, 862 (9th Cir. 1999) (holding that employer exercised reasonable care where it promptly investigated the allegations, interviewed the complainant, the alleged harassers, and other employees at the facility, met with all employees "and made clear that the company would tolerate no retaliation against Plaintiff," terminated one of the harassers, and disciplined the two others). In contrast, CBS did nothing to investigate or remedy Sparks' behavior.

Even apart from CBS's inaction following Hardage's October 2000 complaint, Hardage raised a triable issue of fact regarding the reasonableness of CBS's response to his earlier complaints to Patty Dean. Hardage testified that he complained to Dean "numerous times" about Sparks' unwanted sexual advances and that Dean personally observed Sparks' harassment. He also testified that Dean responded to Hard-

age's complaints by suggesting, "Why don't you just do it and get it over with. It may put her in a better mood." This piece of evidence alone is sufficient to establish a genuine factual dispute as to whether CBS exercised reasonable care in responding to Hardage's complaint. It is difficult to imagine how any reasonable juror could conclude that an employer who suggests that the complainant have sex with a harassing supervisor has acted reasonably to end the harassment. In concluding that Dean was not on notice of Sparks' harassment and that "[t]aken in context, Dean did not unreasonably fail to report the incident to CBS management, thereby triggering CBS's duty to remedy the situation promptly," Maj. op. at 1466-67 the majority improperly credits CBS's account and fails to draw all inferences in favor of Hardage by dismissing his claims as "minimal and vague." *Id*. at 1464.

**2. Whether Hardage Unreasonably Failed to Take Advantage of Corrective Opportunities**

As noted above, the existence of a genuine factual dispute regarding *either* prong of the affirmative defense precludes summary judgment in favor of CBS. Because a reasonable jury could find that CBS failed to exercise reasonable care, Hardage is entitled to a trial even if CBS could establish as a matter of law that Hardage unreasonably failed to take advantage of CBS's corrective opportunities. *See Nichols*, 256 F.3d at 877. Nonetheless, it is clear that on this record, a reasonable jury could find for Hardage on this second element as well.

In *Faragher*, the Supreme Court held that harassment victims have "a duty to use such means as are reasonable under the circumstances to avoid or minimize the damages that result from violations of [Title VII]." 524 U.S. at 806 (internal quotation marks omitted). The "burden [is] squarely on the defendant to prove that the plaintiff unreasonably failed to avoid or reduce harm." *Penn. State Police v. Suders*, ___, U.S. ___, 124 S. Ct. 2342, 2354 (2004).

> [W]hile proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

*Faragher*, 524 U.S. at 807-08. An employer who exercised reasonable care will not be liable "if the aggrieved employee could have avoided all of the actionable harm. . . . [I]f the employee unreasonably delayed complaining, and an earlier complaint could have reduced the harm, then the affirmative defense could operate to reduce damages." EEOC Enforcement Guidance § V.D.

Here, the majority concludes as a matter of law that Hardage unreasonably failed to take advantage of CBS's corrective opportunities because "his first complaint to Dean that he has identified with specificity" was not until about six months after Sparks' harassment began. Maj. op. at 1467. In so holding, the majority fails to view the facts in the light most favorable to Hardage. Hardage testified that he reported Sparks' harassing conduct to Dean on "numerous occasions" and told her, "I don't want to be alone with her." He also testified that Dean personally observed Sparks' harassing behavior, and that in response to Hardage's complaints about Sparks' unwanted sexual advances, Dean suggested that he "just do it and get it over with." Viewing the evidence in the light most favorable to Hardage, a reasonable jury could find that Hardage did not unreasonably delay in reporting Sparks' harassment. Unlike in *Kohler*, where the victim *never* complained about her supervisor's harassment, 244 F.3d at 1181, here, Hardage repeatedly complained about Sparks' behavior.

Moreover, even if Hardage had not complained until October 2000, such a delay could not be deemed unreasonable as a matter of law. As the EEOC Enforcement Guidance

explains, "An employee should not necessarily be expected to complain to management immediately after the first or second incident of relatively minor harassment. . . . An employee might reasonably ignore a small number of incidents, hoping that the harassment will stop without resort to the complaint process." EEOC Enforcement Guidance § V.D.1. Here, Hardage testified that the incident in October 2000 was "over the line" and that he went into Dean's office the very next day and told her, "Last night, things went way too far." He explained in his deposition, "When it spilled over to where it affects the team that reports directly to me that I'm responsible for — that's — you know, . . . I felt that it was detrimental, over the line, uncalled for."[4] Finally, even if Hardage's delay in reporting the harassment can be viewed as unreasonable in light of the circumstances, this is a matter for a jury to decide.

The majority also concludes that Hardage's claim fails as a matter of law because "[i]n addition to waiting half a year to make a complaint, when Hardage finally made his complaint he specifically asked the company not to investigate it." Maj. op. at 1468. The majority omits, however, that Hardage opted to handle the matter himself only *after* Falcone provided him with the aforementioned legally inadequate response options. Under these circumstances, it can hardly be said that Hardage's decision to deal with Sparks' sexually harassing actions himself is per se unreasonable in light of his other options that were "do absolutely nothing" or have Falcone, who promised not to take any disciplinary actions against Sparks, "very nicely talk with her . . . and ask [her] to please, let's just lay back on this a little bit."

In sum, Hardage complained numerous times to his imme-

---

[4]Notably, the incident in October 2000 is the only incident of harassment that CBS characterizes as "work related." If this is correct, then Hardage could not be deemed unreasonable in failing to report Sparks' earlier conduct to CBS.

diate supervisor, who personally observed the harassing behavior, yet she ignored his concerns and even suggested that Hardage sleep with Sparks "to put her in a better mood." Moreover, it is undisputed that Hardage formally complained the day after the incident in October 2000, when he felt "things went way too far." Contrary to the majority's conclusion, CBS has not established as a matter of law that Hardage unreasonably failed to take advantage of its corrective opportunities.

***

An employer who is on notice of alleged harassment has a duty to adequately investigate and take prompt corrective action reasonably calculated to end the harassing behavior. Despite having notice of Sparks' unwanted sexual advances, CBS did nothing. Accordingly, I would reverse the grant of summary judgment and remand for a trial.